WILLIAM E. WOODRUFF, and others, *against* THE STATE.

ERROR *to Pulaski Circuit Court.*

The act of October 30, 1836, fixing the salaries of the Governor, Auditor, Treasurer, and other officers, fixed the salary of the State Treasurer at seven hundred dollars, in full, for all duties required of him by law, repealed all former statutes by which any fees, or perquisites, were allowed the Treasurer, for any duties discharged connected with his office; and thereafter he could receive no other compensation.

The previous laws, therefore, allowing him, in addition to his salary, ten per cent. on the amount received by him in redemption of bounty lands, were by that act repealed.

The act of November 3, 1836, providing " that the existing acts in relation to the redemption of, and collection of taxes on military bounty lands, shall be applicable also to entered lands, and lands of any other description, which may have been stricken off to the Territory or State, for the non-payment of taxes," did not revive these provisions of the previous laws.

In construing statutes, the intention of the Legislature is a fit and proper subject of inquiry.

Such a construction ought to be put upon a statute as may best answer the intention the makers had in view; and this intention is sometimes to be collected from the cause or necessity of making the statute, and sometimes from other circumstances.

When discovered, the intention ought to be followed with reason and discretion in the construction of the statute, although such instruction seem contrary to the letter.

Such construction should be put upon a statute as will not suffer it to be eluded.

On the 26th October, 1837, there was no statute imposing any pecuniary penalty upon any public or private debtor for retaining or refusing to pay over money, except the statute of Nov. 3, 1836, defining the rate of interest on recoveries, contracts and legal liabilities, under which no higher rate of interest than six per cent. could be collected, unless a higher rate was stipulated in the contract.

For whatever amount, therefore, the Treasurer was indebted to the State, on the 26th. October, 1837, the State is entitled to judgment, with interest, at the rate of six per centum, per annum, and no more.

So much of the Acts of 5th March, 1838, and 13th December, 1838, as provided that the Treasurer should pay twenty-five per centum, per annum, on that previous indebtedness, from October 6, 1837, till paid, are provisions impairing the obligation of a contract, and consequently unconstitutional and void.

Contracts may be made by and with a State, as well as an individual, and a State may contract with its own citizens. Rights once vested, privileges once granted or sanctioned by the law of the State, if within the constitutional limits, may be forfeited; but cannot be arbitrarily divested, or withdrawn by future legislation.

Any law which enlarges, or in any manner changes the intentions of the parties, resulting from the stipulations in the contract, necessarily impairs it. The name or degree in which this change is effected, can in no respect influence the conclusion. For whether the law affects the validity, the construction, the duration, the discharge, or the evidence of the contract, it impairs its obligation, though it may not do so to the same extent in all the supposed cases. Any deviation from its terms, by postponing or accelerating the period of its performance, which it prescribes, imposing conditions not expressed in the contract, or dispensing with the performance of those which are a part of the contract, however minute or apparently immaterial in their effect upon it, impairs its obligation.

When the State Treasurer was elected, and gave his bond, a contract was entered into between him and his securities and the State, by which he and his securities agreed that he should perform all the duties then required, or that should be required of him by

law, as Treasurer, or in default thereof, they would pay all damages sustained, to the extent of the bond. The State agreed that he should enter on his office, and enjoy all its emoluments, rights and privileges.

The fundamental principles of government require that, where a citizen enters into an obligation to perform any stipulated duty, the penalties for a failure, on the one hand, or an abridgement of his privileges on the other, should neither be increased nor diminished.

This was an action of debt, brought in the name of the State, against the plaintiffs in error, on the official bond of William E. Woodruff, given by him as Treasurer of the State, with the other plaintiffs in error, as securities, dated October 27, 1836. Breaches were assigned in the declaration according to the statute. The breach alleged, that Woodruff, when Treasurer, had received on account of the State, the sum of $2,385 18 cents, which he had not paid over or accounted for, whereby he had become liable to pay that amount, with interest at twenty-five per cent. per annum, on that amount, from October 26, 1837, until paid.

To this declaration several pleas were interposed. The only one material to be considered, averred, that, as to the sum of $2,100 43 cents, the said Woodruff, as Treasurer, from the 27th of October, 1836, to the 31st of October, 1837, received of divers individuals divers sums of money, amounting in all to $21,004 35 cents, for the redemption of lands struck off to the Territory and State, for the non-payment of taxes; of which amount he had paid over $18,905 92 cents, and had retained $2,100 43 cents, being commissions at the rate of ten per centum, by law allowed to him upon the amount so received for the redemption of lands; and that his settlement had been duly audited and allowed by the Auditor of public accounts.

As to the residue of the sum claimed, being $294 75, the plea stated that, being authorised under the act of the General Assembly, approved October 29, 1836, to receive from the Secretary of the treasury of the United States, the State's dividend of the surplus revenue of the United States, under the act of Congress of 23d June, 1836, and to receipt therefor, &c.; and having received divers transfer drafts from the Secretary of the treasury, amounting in all to $236,757 49 cents, he proceeded to collect these transfer drafts, and receive the proceeds of them, at various points, both without and within the State; and in doing so necessarily and unavoidably expended

$595 thereof, that the residue be paid over into the State Bank, retaining only the said sum of $294 75 cents, part of that sum of $595.

To this plea the State demurred, on the ground that the Treasurer was not by law entitled to any such commission, and that his withholding each of the sums was without authority of law. The demurrer was sustained; and by agreement the other issues awaited the determination of the supreme court on the demurrer.

ASHLEY and WATKINS, for plaintiff in error:

The first question which presents itself, on the assignment of errors in this case is, whether the circuit court erred in sustaining the demurrer of the defendant in error, to the second plea of the plaintiff in error; or in other words whether Wm. E. Woodruff, as Treasurer of the State, was entitled to the sum of $2,100 43 cents, being ten per cent. commissions, on the amount of $21,004 35 cents, received by him as Treasurer for the redemption of lands, and the further sum of $294 75 cents, parcel of the surplus revenue.

That the Treasurer had such authority, is to be collected and inferred from the constitution, and various statutory enactments in force, at and previous to the 25th day of December, 1838. The constitution, *Schedule*, *section* 2, provides that all laws then in force, in the Territory of Arkansas, which are not repugnant to the constitution, shall remain in force, until they expire by their own limitations, or be altered or repealed by the General Assembly; and it cannot, with any propriety, be urged that because the officers of the Territory were superseded by those of the State, that the various laws in force, for instance those relating to the Auditor and Treasurer, and those regulating the redemption of lands, will not continue to be in force, and applicable to the State Auditor and Treasurer, who had the same or similar duties to perform, especially in reference to the laws for the redemption of lands, under the State, as they had under the Territorial form of government.

The laws, under which it is believed that Mr. Woodruff, as late Treasurer, is entitled to such commission, are: "An Act supplementary to an Act, regulating the collection of taxes on military bounty lands;"

approved October 31st, 1827. *Acts of Ark.* 1827, *p.* 65, 6, 7, *sec.* 4; *Steele & McCamps. Dig. p.* 489, *sec.* 74. "An Acts uplementary to an Act, entitled an Act, to regulate the collection of taxes on military bounty lands." *Acts* 1831, *p.* 82, *sec.* 2; *Steele & McCamps. Dig. p.* 482, *sec.* 56. *The Act of November* 15th, 1833. *Acts Ark. p.* 26; *and the Act of the* 3d *November,* 1835. *Acts Ark.* 1835, *p.* 73, are silent in regard to the commission of the Treasurer; they give to the Auditor some additional fees for the increased labor which they require of him; but they contain nothing which is inconsistent with or repugnant to the previous Acts, which gave that commission to the Treasurer, upon the redemption of all bounty lands, which had been before then, or might thereafter be stricken off to the State, for the non-payment of taxes. Such, at least, is the construction given them by the digesters of the Territorial laws in 1835; and which has been acted on by all Treasurers previous to Mr. W., and especially his immediate predecessor, who, while acting under the constitution and laws of 1836, up to the date of Mr. Woodruff's commission, continued to charge and receive such per cent. without any question as to its legality, and such is the construction of the Auditor of the State, who, as is stated in the plaintiff's plea, on the 31st day of October, 1837, acting as such Auditor, audited and allowed Mr. W.'s account as Treasurer, retaining such per centage, in due form of law. In addition to the above laws, the *Act of Nov.* 3d, 1836, *Acts Ark.* 1836, *p.* 202, *sec.* 13, declares the existing Acts in relation to the redemption of, and collection of taxes on, military bounty lands, applicable, also, to entered lands, and lands of every other description, which may have been stricken off to the Territory or State, for the non-payment of taxes thereon. Thus, it is believed, covering the whole ground, as to all lands redeemed from that time on, and during the whole time Mr. W. continued to act as Treasurer.

But it has been contended by some, that the Act of October 3d, 1836, entitled "An Act, affixing salaries to certain offices in the State of Arkansas," *Acts Ark.* 1836, *p.* 46, passed two days after the election, but previous to the commissioning of Mr. Woodruff, cuts off all contingent fees or perquisites from the Auditor and Treasurer, and gives to each a fixed salary of seven hundred dollars per annum, for

all the duties required of them by law.   In the first place, it might be well to examine the phraseology of the Act in question, and see whether the expression, and "such other fees as may be allowed by law," does not relate back and apply, as well to the Auditor and Treasurer, as to the Secretary of State, and the several Attorneys for the State, who are all embraced in one section.   If, upon such examination, any doubt exists as to the literal construction of that Act, we have to revert to the other Acts and official proceedings of the General Assembly in *pari materia*, to ascertain what the intention of the Legislature was; to which intention, if capable of being ascertained, any literal construction which is at least doubtful, must yield.   It appears upon the record that while Mr. Woodruff continued to act as Treasurer, he was under bond to the State in the enormous sum of $300,000, to which the bonds of previous Treasurers were trifling in comparison.   That he was required to receive (*see Acts Ark.* 1836, *p.* 199,) the portion of the surplus revenue of the United States, which this State was entitled to receive as her dividend, under the act of Congress, approved 2d June, 1836, entitled " An Act, to regulate the deposites of the public money."   That the then Treasurer, in addition to the ordinary duties and responsibilities of his office, did collect and receive at several distant points out of this State, and transport and have in his personal safe keeping, from time to time, the extraordinary sum of $286,757 49; (and this before the Bank of the State went into operation, in which the Treasurer is authorised to make deposites; which then cease to be at his personal risk.)   Under the Act of Nov. 5th, concerning Territorial scrip, *Acts Ark.* 1836, *p.* 160, the Treasurer was required to perform the intricate and laborious duty of receiving and cancelling scrip before then issued, of various issues and denominations, upon which interest had accrued, and to keep a regular account of the scrip so received, with the name of the person from whom the sum was redeemed.   This, and the duties which the Treasurer necessarily performed in the redemption of lands, were temporary, and might properly be termed extraordinary duties.

For all this labor and responsibility, then, is it to be presumed that the General Assembly intended to bestow upon the State Treasurer the paltry compensation of $700 per annum, while they cut off the

Woodruff, and others, *against* the State.

perquisites which previous Treasurers had enjoyed without the hundredth part of such labor and responsibility, and this too, while the very act of October 27th, 1836, which regulated the duties of Auditor and Treasurer, made it lawful for the Governor, in case of *the absence from the State* of the Auditor or Treasurer, to make an appointment, for the time being, of some suitable person, to perform the duties of such office, until such absence should cease; who should receive the same compensation allowed by law to the officer whose duty he is appointed to perform, in proportion to the time he should be engaged in the discharge of the duties of said office; *provided*, that, in all cases, the sums allowed to the persons so appointed, shall be deducted from the *standing salaries* allowed by law to the Auditor or Treasurer, as the case may be. The presumption is irresistible, that such was not the intention of the General Assembly.

It is indeed true that the subsequent Legislatures of 1837 and '8, or a majority of the Legislature, by the resolution of the 28th of February, 1838, by which a committee was instructed *to enter upon the Treasurer's books*, an order directing him to pay over into the State Bank, to the credit of the State, the sum of $2100 43, the sum retained by the Treasurer, as commission of ten per cent. on the amount paid into the Treasury for the redemption of lands, and also by the Act "*making certain appropriations*," approved *March 15th*, 1838; in which it is enacted, "That William E. Woodruff, Treasurer of this State, shall pay *twenty-five per cent. per annum*, on the sum of two thousand three hundred and ninety-five dollars and eighteen cents, *or such sum as shall be found due the State*, by the decision of some competent judicial tribunal, &c., from the *26th day of October*, 1837, until the sum shall be paid over, &c., and the act of the 13th December, 1838, requiring the *Prosecuting Attorney of the fifth judicial circuit*, to bring suit against William E. Woodruff, late Treasurer, upon his official bond, &c., attempted by judicial and *ex parte* Legislation, to put a different construction upon the previous existing laws of the land.

It would not be allowed to the plaintiff in error, to argue that these last mentioned Acts and Resolutions show, on their face, to have been the result of partizan, political, or personal ill feeling, or that the Au-

Woodruff, and others, *against* the State.

ditor of the State, whose right to perquisites and fees of office, is cut off in precisely the same manner, and to the same extent as that of the Treasurer, if the construction claimed for the Act of October 3d, 1836, be correct, continued, after the passage of that Act, to charge and receive, in his public official capacity, over and above the fixed salary of seven hundred dollars, which it allowed—all the extra compensation and fees allowed the Auditor and Treasurer, by previous existing laws, without censure or investigation. Yet, it is surely legitimate and proper, to look at the cotemporary acts of the General Assembly on this same subject, in order to determine fairly the question now before the court.

We see, then, by the Act of December, 1837, the Governor was authorized to borrow from the Bank of the State fifty thousand dollars, to be paid into the State Treasury, for paying the current expenses of the State, and so in like manner the Governor was authorized by the Act of March 3d, 1838, to borrow fifty thousand dollars for the payment of the expenses of the State for the year 1838, thus relieving the State Treasurer from one of his most laborious and intricate duties, that of carrying on the financial operations of the State by issuing scrip, drawing interest, to be registered, and subsequently cancelled with the same degree of particularity. We see by the Act in the *Rev. Stat.* concerning the Auditor and Treasurer, put in force by the Act of the 14th December, 1838, that it is made the duty of the Treasurer to deposite all moneys belonging to the State, which may come to his hands, within ten days after the receipt thereof, in the Bank of the State of Arkansas. Thus relieving the Treasurer from all responsibility for the loss or destruction of the public funds while so in deposite, and from that anxiety and watchfulness, which the personal custody of those funds would occasion; and yet, by the same Act of December 14, 1838, the official bond of the Treasurer was reduced from three hundred, to one hundred and fifty thousand dollars—his salary increased from seven hundred to one thousand dollars—and by the Act approved and in force March 3d, 1838, *Rev. Stat. p.* 398, *sec.* 21: he, [the Treasurer,] is allowed the sum of five per centum on all sums received by him for the redemption of lands sold for taxes.

If these cotemporary Acts afford any clue to the construction of the Act of October 3d, 1836, it could not have been the intention of that Act to have deprived the Treasurer [and Auditor], from perquisites which the existing law allowed. It will be perceived by the facts stated in the plea, and admitted by the demurrer, that Mr. W., as first Treasurer of the State, performed and incurred a degree of labour and responsibility, which no officer before or since has undergone, and if the law be so, that he is only entitled to the salary of $700, subject to a deduction by law, while absent on the business of the State, it is only left to him to exclaim, *ita lex scripta est, sed perquam durum est.*

As to the sum of $294 75, parcel of the sum of $2,395 18, and for which the plea answers, the facts set out in the plea and admitted to be true are, that Mr. W., as Treasurer, under the Act of Assembly, which required him to receive and receipt for, &c., the proportion of the surplus revenue of the United States, coming to this State, did proceed diligently to collect and receive and transport the same, at and from divers points and places, as well without as within this State, amounting to the sum of $286,757 49; and *that in so col-lecting and receiving that amount of money, he necessarily and una-voidably expended a certain portion thereof, to wit: $595.* For the successful accomplishment of this arduous duty, at a period of the greatest and most general financial derangement and difficulty known to the history of the country, without loss to the State, his account for actual and unavoidable expenses, was only $595, the Legislature of 1837, had the magnanimity to allow $300 25 of that amount, leav-ing the residue $294 75, which the Treasurer felt himself entitled to retain, if by no other law than that of self-preservation, and upon no other principle than that of common right and *common justice.*

The second assignment of error sets out, that the court below, hav-ing overruled the demurrer, the case rested there, and the court after rendering judgment for the penalty of the bond, by consent of parties proceeding to enquire into and assess the damages, assessed and awarded execution to the defendant in error, for the sum of $2,395 18 damages, with *interest thereon,* at twenty-five per centum per annum, from the 26th day of October, 1837, till paid.

Woodruff, and others, *against* the State.

The colour for this proceeding seems to have been, the Act of 5th March, 1838, entitled " An Act, making certain appropriations," by which it was enacted, " That William E. Woodruff, Treasurer of this State, shall pay twenty-five per cent. per annum, on the sum of two thousand three hundred and ninety-five dollars and eighteen cents, or such sum as shall be found due the State by the decision of some competent judicial tribunal, &c., from the twenty-sixth day of October, eighteen hundred and thirty-seven, until the same shall be paid over to the Bank of the State of Arkansas; and that the Treasurer pay twenty-five per cent. per annum on all other money that he may unlawfully retain in his hands, over ten days after the same is received by him, provided it shall not be decided by some judicial tribunal, that the said Woodruff is entitled to the same."

This *expost facto*, or retroactive law, was passed several months after the commission of the act by the Treasurer, which it designed to punish by imposing a heavy penalty. By the enactment itself, it is admitted, that there is a sum in controversy between the Treasurer and the State, which sum is so far uncertain that it is left to be ascertained by the decision of some competent tribunal, yet enacts that the Treasurer shall pay twenty-five per cent. per annum, from a day nearly five months previous to the passage of the Act, upon such sum as should thereafter be found by the decision of some competent tribunal, to be due from the Treasurer to the State. It was indeed a master stroke of Legislation; but we apprehend it will not be seriously contended, by the Attorney for the State, that the judgment of the court below is not, upon the ground set out in this assignment, clearly erroneous.

In conclusion, we call the attention of the court, to the agreement of record, that upon the adjudication in this court of the matters of law arising upon the demurrer of the defendant to the second plea of the plaintiff in error, this cause shall be remanded to the court below for the trial of the issues of fact joined therein.

CLENDENIN, ATTO. GEN., *Contra:*

How this claim of the Treasurer will compare with the Act under

which he was elected, and by which his salary was fixed, it will be our province here to examine.

By the Act of the General Assembly of this State, approved October 30, 1836, the officers therein mentioned, were to receive for *all the duties required of them by law* the sums affixed to their respective offices, to wit: The Treasurer, the sum of seven hundred dollars, as his salary, per annum—*see Acts of* 1836, *page* 46; and such other fees as may be allowed by law; this Act, it is argued, rescinded all other laws in relation to this office, and there is no after Act allowing the Treasurer to receive the amount of ten per cent. upon all sums paid into the Treasury for the redemption of lands stricken off to the Territory or State.

By an Act of the Territory of Arkansas, approved October 21, 1827, (*See Laws of the Territory of Arkansas, page* 67, *sec.* 4), the Treasurer is authorized to receive the sum of ten per cent. for all moneys paid for the redemption of lands, &c.

And by an Act, approved November 7, 1831, (*See Acts of Territory of Arkansas*), the Treasurer is authorized to recive the same amount.

Under these several Acts the Treasurer received as his annual salary the sum of three hundred dollars; and under the office of Treasurer, as prescribed by the constitution, the same officer received the sum of seven hundred dollars, and, as it is argued here, as full compensation for all the duties that may be required of him by law.

As to the sum of $294 75, there does not appear to be any authority of law for withholding it, excepting in the Act before referred to, authorizing the Treasurer to collect the surplus revenue of the United States apportioned to the State of Arkansas.

These, it is believed, are the facts of the case, as they appear upon the record, and the question which was decided by the court below, and which is now respectfully submitted to this court is, whether, under the provisions of the laws before referred to, the Treasurer of the State had a right to claim and withhold fees allowed to the Treasurer of the Territory as part compensation for his services.

DICKINSON, J., delivered the opinion of the court:

The question raised by assignment of error will be determined by

the construction given to the several statutes relating to the State Treasurer, and regulating his duties, &c. By the schedule to the constitution (section 2), all laws then in force, in the Territory of Arkansas, not repugnant to the constitution, should remain in force until they expired by their own limitation, or be altered or repealed by the General Assembly; and section five, declares that, "All civil and military officers then holding commissions under the authority of the United States, or of the Territory of Arkansas, were authorised to hold and exercise their respective offices until they should be superceded by law;" consequently, the same officers continued in the exercise of their authority under the State government, in the same manner, and received the same compensation as before. The first General Assembly of the State was held in September, 1836; at that time, the Treasurer, by virtue of previous laws, was allowed, in addition to his salary, ten per cent. on the amount received by him in redemption of bounty lands, by the Auditor for the non-payment of Taxes, (*S. and McCamp*, 485, '9). On the 30th of October, 1836, the General Assembly, in organizing the State government, by an Act, entitled "An Act, affixing salaries to certain officers of the State of Arkansas," declared that, "The several officers, hereinafter mentioned shall receive, annually, and payable quarter yearly, for all the duties required of them by law, the following sums, to-wit: The Governor, two thousand dollars; the judges of the supreme court, each, eighteen hundred dollars; the judges of the circuit court, each, twelve hundred dollars; the Secretary of State, seven hundred dollars, *with such fees as may be allowed by law;* the Auditor of public accounts, seven hundred dollars; the State Treasurer, seven hundred dollars; the Attorneys of the several circuits, each, three hundred dollars, *with such other fees as may be allowed by law.*" The language of the Act is positive. The Governor, the judges of the supreme and circuits courts, the Auditor, and the State Treasurer, shall receive their salaries annually, and be paid quarter yearly for all duties required of them by law. But the Secretary of State and Attorneys of the circuits may, in addition to their salaries, receive such other fees as may be allowed by law. The acceptance of the office was voluntary; there could be no misconception of the obligations attached to it. On the 30th September, 1836,

an Act was passed, declaring, " That, in all cases where statutes shall be repealed, and the repealing statutes shall afterwards be repealed, the first statutes shall not thereby be revived unless by express words." That the Act of 3d October, 1836, by affixing the salary of the Treasurer, and declaring it to be in full, " for all the duties required of him by law," repealed all other statutes, by which any fees or perquisites were allowed for services performed, in discharge of any duty connected with his office, cannot, we conceive, be doubted. It is however, contended that the 13th section of the Act of November 3d, 1836, entitled, " An Act, prescribing the mode of confirming titles to land, sold under the laws of this State, and for other purposes," which provides, " That the existing Acts in relation to the redemption of, and collection of taxes on, military bounty lands, shall be applicable also, to entered lands, and lands of any other description, which may have been stricken off to the Territory or State, for the non-payment of taxes thereon," &c., also revived so much of said Acts as allowed fees and perquisites to the Treasurer, for the discharge of the duties required of him by them. That, in construing statutes, the intention of the Legislature is a fit and proper subject of enquiry, is too well settled to admit of a doubt. This intention is to be collected either from the words, the context, the subject matter, the effects and consequences, or the spirit and reason of the law, and other Acts in *pari materia*. It may not, however, be amiss to state and keep in view some of the established rules on the subject. Such a construction ought to be put upon a statute, as may best answer the intention which the makers have in view, and this intention is sometimes to be collected from the *cause* or *necessity* of making the statute, and sometimes from other circumstances; and whenever such intention can be discovered, it ought to be followed with reason and discretion, in the construction of the statute, although such construction seem contrary to the letter of the statute. And such construction ought to be put upon it, as will not suffer it to be eluded. *Bac. Ab.* 1, 5, 10, and authority there cited. The Act of 3d October, 1836, which limits the salary to seven hundred dollars, as a full compensation for all the services required by law, is clearly a restraining statute, as regards any other or further compensation; and here one of

the rules we have laid down, applies with peculiar force:—That such construction ought to be put upon a statute as does not suffer it to be eluded. The *cause* of the enactment of the 13th section of the Act of November 3d, 1836, previously referred to, was to include a class of cases not embraced in the previous Acts, and to enable the State to receive the revenue due her. Legislative action, therefore, was necessary. This was done by extending the previous law to cover them, by which individuals could also retain their lands from the lein held by the State, for the taxes due. So far, the intention of the Legislature is apparent, and the cause and the necessity of the extension of these provisions, equally so. Would it be a reasonable construction, that even doubtful language should defeat the will of the Legislature, clearly expressed in the Act of the 3d of October, 1836, which, by declaring the salary in full of all services required by law, repeals all other laws then in force, by which any other or further compensation was given? Will it be insisted upon, in the face of the Act of the 30th September of the same year, which declares: That to revive a law, previously repealed, there must be express words to that effect? We think not. The frame and scope of all the Acts have been examined, their titles, preambles, sections, and provisions, compared and weighed. This has all been done with the care and attention which the subject demands; and we have come to the conclusion, that the Legislature expressly extended the existing acts in relation to the redemption of, and collection of taxes on military bounty lands, &c., so far only as to embrace all other lands which may have been stricken off to the Territory or State, for the non-payment of taxes due thereon. For the provision, as regards the fees and perquisites formerly allowed the Treasurer, having been repealed, was not, at the time of the passage of this act, *existing*, and therefore would have required express words to that effect, before the law would reach and revive that which had ceased to *exist*.

We have endeavored to give the several acts of the General Assembly a fair and just interpretation, upon the established rules of construction. Courts of law cannot consider the motive which may have influenced the Legislature, or their intentions, any further than

are manifested by the statutes themselves. The Treasurer could not, therefore, lawfully receive any other compensation than the salary of seven hundred dollars, allowed by the act of 3d October, 1836. We are aware that the duties imposed upon the State Treasurer were, at the time, onerous, and the responsibility great; and were of that character as to render it evident that the person who accepted the office, with the legal compensation, must have done so from motives of pride or mistaken notions of its pecuniary value. But this Court can neither console the disappointed nor relieve the distressed, in any other way than by faithfully administering the law, and thereby securing to all their rights and privileges. At the time Woodruff was elected Treasurer, and, with the other plaintiffs in error, executed his bond for the performance of the duties of his office, there was no statute imposing any pecuniary penalty upon any public or private debtor for the retaining or refusing to pay over money, other than the act of November 3d, 1836, entitled "An act specially defining interest on money, and regulating the recovery thereof," which provides: That all recoveries, contracts, and legal liabilities for the payment of money, when there is no express agreement to pay interest, shall bear interest at the rate of six per centum per annum, from the time the same shall be recovered or become due; and in all cases where the interest is, or shall be, expressed in the contract or agreement between the parties, any rate of interest expressed or agreed, and not exceeding the rate of ten per centum per annum, shall be legal; and the Courts shall, in all cases, ascertain the rates of interest to be recovered, as aforesaid, and the time from which, and until which, the same shall be computed and recovered, and express the same in the judgment; and the same shall be expressly stated in the body of the execution to be issued on any such judgment, and shall be collected with, and in like manner as the principal debt, damages, and costs; and no judgment shall bear a greater or less rate of interest than that agreed upon or fixed by law, as aforesaid. So that at the time of the alleged indebtedness, (viz: 26th October, 1837), this was the only law in force governing the rate of interest or damages, upon recoveries, contracts, and legal liabilities for the payment of money.

And that there was a legal liability to pay, arising upon the obligation of the plaintiff in error with the State, cannot be doubted. "A judgment," says Blackstone, in his Commentaries, (3 vol., 396,) "is the determination and sentence of the law; the conclusion that naturally and regularly follows from the premises of law and fact." If this be the law, and no one will, we presume, controvert it, the conclusion that follows from a judgment in this case, as far as the plaintiffs in error are interested, in the absence of any other statutory provisions, would be, that they are only bound to pay the amount which was found due the State, with interest at the rate of six per centum per annum. If this is conceded, it is brought within the act of the 3d November, 1836. Why is it, however, that we find judgment is entered with damages, or interest, (by which name it is called), at the rate of twenty-five per centum per annum, from the 28th October, 1837, until it shall be paid? Why make this case an exception? The General Assembly had provided the mode of bringing suit against persons indebted to the State. They had done the same when one individual was indebted to another. They had left both classes to be governed by the same general rule of law, and, by making no distinction at the time, declared the legal consequences should be the same in the one case as in the other. We are told there was authority for it, and are accordingly cited, first, to a resolution of the General Assembly, of the 28th February, 1838, by which it was resolved, " That the committee on the books of the Auditor and Treasurer, enter on the books of the Treasurer an order, directing him to pay into the Principal Bank of the State of Arkansas, to the credit of the State, the sum of twenty-one hundred dollars and forty-three cents, the sum retained by the Treasurer as commission of ten per cent. on the amount paid into the Treasury for the redemption of lands;" and "That the committee enter on the books of the Treasurer an order, requiring the Treasurer to pay over to the Bank the sum of two hundred and ninety-four dollars and seventy-five cents, the sum retained by the Treasurer out of the surplus revenue, over what was necessarily expended in bringing the money from Natchez;" and "That the committee report to this General Assembly the compliance or non-compliance of the Treasurer with the requisitions of the fore-

going resolutions."    Also, to the 13th section of an act of the 5th of March following, entitled, "An act making certain appropriations," in which the General Assembly declared, "That William E. Woodruff, Treasurer of the State, *shall* pay twenty-five per centum per annum on the sum of two thousand three hundred and ninety-five dollars and eighteen cents, or such sum as shall be found due the State by the decision of some competent judicial tribunal, the sum found in his hands by the committee on the books of the Auditor and Treasurer, which he refused to pay over in compliance with the resolution of this General Assembly, approved the first of March, 1838, from the sixth day of October, 1837, until the same shall be paid over to the Bank of the State of Arkansas; and the Treasurer pay twenty-five per cent. per annum on all the money that he may unlawfully retain in his hands over ten days after the same is received by him, provided, it shall not be decided by some judicial tribunal that the said Woodruff is entitled to the same."    And also, on the 13th December, the same year, another act was passed, entitled, "An act requiring the Prosecuting Attorney of the fifth judicial circuit to bring suit," by which it was enacted, " That it shall be the duty of the Prosecuting Attorney of the fifth judicial circuit of this State, and he is hereby required, to bring suit against William E. Woodruff, late Treasurer of this State, on his *official bond* as Treasurer, for the *recovery* of the sum of two thousand three hundred and ninety-five dollars and eighteen cents, and the *damages* on the same, agreeably to the provisions of the act of the General Assembly of the State, approved the 5th of March, 1838."    Whatever doubts may have been entertained as to the intentions of the Legislature, under the act of 3d of March, in imposing the twenty-five per cent. per annum, were dissipated by the act of the 13th December, where they imperatively command the Attorney of the State to bring suit on the *official bond,* thereby showing conclusively their object to extend the liability to the *security,* and *engraft* the damages upon their undertaking.    It is not necessary to determine how far Woodruff himself would have been liable, in the absence of the act last referred to; nor shall we attempt to inquire into it; for the whole must stand or fall upon the official bond, and all, or none, are

necessarily bound. The allegation in the declaration is, "That Woodruff had been duly elected Treasurer of the State, and the other defendants bound themselves with him, in a certain penalty, that he, the said Woodruff, should perform all the duties then required, or which should be required, by law, to be done as Treasurer of said State: if he did not do so, they bound themselves to pay the debt, and the damages and costs incurred for the detention of it. The duties were fixed by law, with the privileges and compensation. It is not our intention, at this time, to extend our inquiries, or to give any opinion, as to the precise meaning of the term *obligation*, or as to how far or to what objects it extends, nor by what bounds it is limited; but simply to ascertain if this be such a contract between the plaintiff and the State, as to bring them within the constitutional inhibition, that it shall pass no *ex post facto* law, or law impairing the obligation of contracts, or either of them. The term *contract* comprises, in its full and more liberal signification, every description of agreements, obligations, or legal ties, whereby one party binds himself, or becomes bound, expressly or impliedly, to pay a sum of money, or perform or omit to do a certain act. It is contended, by some writers, that the Constitution distinguishes between a contract and the obligation of a contract. Judge Story says, "The latter is the law which binds the parties to perform the agreement." The law which has this binding obligation, must govern and control the contract in every shape in which it is intended to bear upon it. Then, if a party contracts to pay a certain sum, on a certain day, it can make no difference whether the money is to be paid to an individual, to a company composed of individuals, or to the State itself. It is to the civil, as contra-distinguished from the moral obligation, which the Constitution has in view, when it declares, "it shall not be impaired." It is to reach in all cases where there is a legal right conferred on another. That contracts cannot be applied to a State when acting in its corporate capacity, is a sophism which we are by no means prepared to admit. It is an every day occurrence, and is often necessary to carry out the objects of the Legislature. It contracts for its public printing, its buildings, and the many objects indispensable to the public safety and the due

administration of justice. Rights once vested, privileges once granted or sanctioned by the law of the State, if within the constitutional limits, may, it is true, be forfeited, but cannot be arbitrarily divested or withdrawn by any future legislation; and they will be protected in the possession of one and the enjoyment of the other. The principle, that a State cannot contract with citizens, and that the contract is not binding upon both, was, we think, not long since, successfully exploded. In our own State, it is not only of frequent occurrence, but recognized by the Constitution, and regulated by statute, (*Rev. Stat.*, 742), in authorizing suits to be brought against the State, directing the mode of proceeding, and making the judgment binding upon the State. Sovereignty alone is in the people, and they, by a written Constitution, have limited the legislative powers, by prohibiting them from passing any law, in whatever form, impairing the obligation of a contract. As to what may be deemed impairing the obligation of a contract, in the sense of the obligation, cannot be better elucidated than in the words of Judge Story, (*Story's Commentaries*, 3 *vol.*, 250:) " It is perfectly clear, (he says,) that any law which enlarges, abridges, or in any manner changes the intentions of the parties, resulting from the stipulations in the contract, necessarily impairing it, the name or degree in which this change is effected, can in no respect influence the conclusion; for, whether the law affects the validity, the construction, the duration, the discharge, or the evidence of the contract, it impairs its obligation, though it may not do so to the same extent in all the supposed cases. Any deviation from its terms, by postponing or accelerating the period of its performance, which it prescribes; imposing conditions not expressed in the contract, or dispensing with the performance of those which are a part of the contract, however minute or apparently immaterial in their effect upon it, impair its obligation."

Such are the views entertained by one of the most profound and elementary writers of the age. It is not intended, at this time, to go into a full exposition of the obligation imposed by the acceptance of an office, or the extent of the powers of a State to make contracts in general, or the consequences resulting from them. There is certainly a marked difference between a compact and a law: the former is an

act of two or more parties, which produces due obligation on both, by their own immediate or direct consent; the latter is an act of a superior, which commands, permits, forbids, announces rewards and punishments, and provides for the general good, by general laws. A law provides for the future only, and can have no retrospective operation, or impair the obligation of contracts. The question then recurs, as to how far the case of the plaintiffs in error is brought within the prohibition as contained in our Constitution—that no law impairing the obligation of contracts shall be passed.

We think that we have already shown conclusively, to our minds, at least, that there was a contract, between the State on the one side and the plaintiffs in error on the other, that Woodruff should perform all the duties then required, or which should be required of him by law, as Treasurer, or, in default thereof, they would pay all the damages sustained, to the extent of the bond: and the State then permitted him to enter upon his office, and enjoy all its emoluments, rights, and privileges. If the Legislature could, on the fifth of March, 1838, enact, that the plaintiffs in error should pay twenty-five per centum per annum, from the time the debt of Woodruff to the State became due, from a period antecedent, (26th October, 1837,) notwithstanding the general statute, that all recoveries, contracts, and legal liabilities should bear but six per centum per annum, why could not the same rule be extended, with equally as much justice, to all her debtors, no matter under what circumstances the debt may have been contracted? If it could be done in this case, why may not the same rule be extended to bank debtors, or from one individual to another?

Suppose the Legislature had, by law, on the 5th of March, 1838, declared, that each and every individual who was indebted to the State, to the Real Estate Bank, or to the Bank of the State, on the 26th of October, 1837, should pay interest, or damages, at the rate of twenty-five per centum per annum, until paid, notwithstanding the law, at the time the debts were contracted or became due, gave but six per cent.? We apprehend there would have been a general concurrence, on the part of the community, that the exercise of such a power was unwarrantable, and contrary to every principle of law and

justice. Yet the principle is the same. If the power was rightfully exercised in the case now under consideration, it can be exercised in any other, and may be retrospective, without limit, as to time, or the parties interested, or the object upon which it is to bear. That Government can scarcely be considered free, where the rights of individuals are left solely dependent upon a legislative body, without any restriction. The fundamental principles of government require, that where one of its citizens enters into an obligation to perform any stipulated duty, the penalties for a failure on the one hand, or an abridgement of his privileges on the other, should neither be increased nor diminished. Every reason of justice and policy unites to prove that, at no future period, should a legislative body be authorized to attach punishment for a failure which did not exist when the act was done, suffered, or committed, or enact any law changing or in any way altering the terms of a contract. Such a doctrine would be unjust to parties, ruinous in its consequences, and contrary to every principle of sound legislation. There ought to be certainty in the acts of a legislature, as far as they have an influence on the rights of individuals, as well as uniformity in the bearing they are to have in their interests. This uniformity may extend to the whole community, or to a certain class of cases, or for the non-performance of certain specified duties. Therefore, a law that imposes a certain fine upon all who are guilty of a certain offence, would be general in its character and bearing, and no one would have cause of complaint. But it is manifestly unjust, that where there has been an action of the one legislature upon any subject matter, and a declaration that, in every instance of a breach of the duty specified, there shall be certain damages sustained, or penalties imposed, that another, composed of different persons, and entertaining different views, should afterwards be permitted to select, out of the whole community, one individual, and make him the subject of retrospective legislation, thereby indirectly declaring that in his particular case there is an unusual degree of moral turpitude, and that a punishment not at the time of its commission attached to the offence, and to which no one else in society similarly situated is subjected, shall be inflicted upon him. It is in effect saying, that their prede-

cessors having reposed an unusual degree of confidence in the person, and deceived as to his integrity, or mistaken in his capacity, they will therefore impose upon him an unusual penalty, and direct that it shall be binding from an antecedent period, when they themselves had no power to declare the public will. History gives us too many deplorable instances of tyranny and oppression by legislative bodies, which their successors have endeavored to remedy, by striking them from the statute books; and the Courts have often been compelled to interfere between the people and their legislators, to save them from the ruinous consequences caused by the exercise of abused or usurped powers.

It is repugnant to every principle of justice, to take by law the property of one, and give it to another, by arbitrary rules. Blackstone treats it as a settled rule, that all laws are to commence in future, and to operate *prospectively;* and even in England, where the Parliament is almost omnipotent, Lord Coke says, that " Their acts are to be so construed, that no man who is innocent, or free from wrong or injury, shall, by a literal interpretation, be punished or endamaged." The same doctrine is recognized in all the English and American Courts. Prospective enactments are always, to a great extent, experimental; there is but little light for their guidance, but the history of the past; and the consequences cannot always be foreseen nor prevented at the time. Therefore, the necessity for the exercise of similar powers by their successors, to remedy the defects of previous laws. Laws having for their object clemency and mercy, are generally wise, laudable, and just. But for a Legislature to say their predecessors were too moderate in their views, too lenient to the frailties of others, or that they lacked the capacity to foresee the consequences resulting from their acts; that they have permitted this man to escape without sufficient punishment, or the other without any; and then go on and declare what ought still to be inflicted in the one instance, or increased in the other, would at once strike every mind of ordinary intelligence as a power incompatible with the safety of our institutions. Would this community—would any free people recognize such principles of government, or the exercise of such powers? Where would be the security from oppression, from unjust and unusual punishments? What certainty would there be for the continuance or enjoyment of any of

Woodruff, and others, *against* the State.

their rights? For the principle, once admitted, cannot be limited. 'Tis the Courts, with the independence and fearlessness which are expected from them, without regard to consequences, or being influenced by popular feeling, will interfere, and throw around the victim the sacred shield of justice, impenetrable alike to the shaft of executive or legislative power. If a Legislature can declare an act, which, at the time of its commission, was innocent, an offence against public faith, and assign to it a punishment; or if they can increase, or in any way change the responsibility of a party, may they not with equal justice declare that certain property belongs not to one man, but to another? Unwise legislation is often unequal in its bearing and consequences; but if in accordance with the letter of the Constitution, the Courts cannot interfere otherwise than to carry out and enforce the will of the people, expressed through their representatives. But illegal legislation is caused by a mistaken view or usurpation of powers, either expressly prohibited, or not contemplated by the charter from which their authority is derived. 'Tis then the other co-ordinate branch of the Government must declare the extent of those powers, and how far they have been exceeded.

All legislative bodies are liable, from their number and the peculiar circumstances by which they are surrounded, to err in their views of the effects and consequences of their own acts. They are governed by the same principle as the other co-departments. The great object with each and all, is to secure the life, liberty, and property of its citizens. The Courts, however, being more deliberate in their investigation, with the history of the past before them, as regards the legal consequences by which their enactments must be followed, removed from scenes calculated to exercise any influence over them, and wholly independent in their judgment, are empowered to interpret as well as enforce the public will, when legally expressed.

It is always with reluctance that we so far interfere with the General Assembly, as to declare their acts void. It is, however, a duty which, when properly presented, we are not at liberty to decline. Should we hesitate to meet it and declare the consequences, we should feel that we had thrown down one of the strongest guards of the citizen against the encroachments of legislative authority upon his rights

Woodruff, and others, *against* the State.

and interests. We cannot pass it by because it is doubtful. No matter what may be the doubts or difficulties with which a question is surrounded, it must be decided when it arises in judgment. We have no more right to decline the exercise of a jurisdiction which is given, than to usurp that which is not given. The questions now under consideration have had the most mature deliberation and rigid investigation. We have had all the lights that able discussion and numerous authorities can give us; and are of the opinion, that so much of the second section of the act passed 5th March, 1838, entitled "An act making certain appropriations," as enacts " That William E. Woodruff, Treasurer of this State, shall pay twenty-five per centum per annum on the sum of two thousand three hundred and ninety-five dollars and fifteen cents, or such sum as shall be found due the State by the decision of some competent tribunal, the sum found in his hands by the committee on the books of the Auditor and Treasurer, which he has refused to pay over in compliance with the resolution of the General Assembly, approved the first of March, eighteen hundred and thirty-eight, from the twenty-sixth day of October, eighteen hundred and thirty-seven, until the same shall be paid over to the Bank of the State of Arkansas," is in conflict with so much of the act of November 3d, 1836, entitled "An act more specially defining interest on money, and regulating the recovery thereof," as enacts " That all recoveries, contracts, and legal liabilities for the payment of money, where there is no express agreement to pay interest, shall bear interest at the rate of six per centum per annum, from the time the same shall be recovered or become due; and that no judgment shall bear a greater or less rate of interest than that agreed upon or fixed by law;" which determines the extent of the liability of the plaintiffs in error, for the breach of their contract, as laid in the declaration, which it was the avowed object of the act in question to increase; and so far it must be regarded as being within the prohibition of the Constitution of this State, and of the United States, that no law impairing the obligation of contracts should ever have been made. The breach in the declaration is sufficient, and avers all the material facts necessary to a recovery. The allegation relating to the twenty-five per cent. per annum, was unnecessary, and, in the opinion of this Court, ought to

Woodruff, and others, *against* the State.

be stricken out, as wholly foreign and impertinent, as the enactment purporting to give it, and by virtue of which it is claimed, is void. It can therefore only be considered as surplusage; and as, without it, enough is left to show there was cause of action, it will not vitiate that which is good. And the judgment of the Circuit Court having been given for the twenty-five per centum per annum, under the act of the Legislature herein declared to be void, is reversed.