Judge Wendell L. GRIFFEN *v.* The ARKANSAS JUDICIAL
DISCIPLINE and DISABILITY COMMISSION

03-662                                                           130 S.W.3d 524

Supreme Court of Arkansas
Opinion delivered November 20, 2003

*Wendell L. Griffen,* Judge, *pro se*; and *Wilson, Engstrom, Corum & Coulter,* by: *Nate Coulter,* for petitioner.

*Mike Beebe,* Att'y Gen., by: *Jeff R. Priebe,* Ass't Att'y Gen., for respondent.

ROBERT L. BROWN, Justice. Petitioner, Judge Wendell L. Griffen, petitions this court to grant a writ of *certiorari* to the respondent, Arkansas Judicial Discipline and Disability Commission (Judicial Commission), declaring a letter of admonishment invalid and quashing it. Judge Griffen mounts several arguments in support of his petition: (1) he did not violate the Arkansas Code of Judicial Conduct; (2) the remarks he made to the Arkansas Legislative Black Caucus are protected under the First Amendment to the United States Constitution as free speech and as the free exercise of religion; and (3) he was denied his right to due process of law because the complaint made against him was anonymous and because the Judicial Commission's decision was arbitrary, capricious, and contrary to the evidence. We issue the writ of *certiorari* and quash the admonishment because the canon involved, Canon 4C(1), is not sufficiently drawn so as to advise Judge Griffen under what circumstances he might consult with a legislative official on a matter of personal interest. Because of this, the canon did not place Judge Griffen sufficiently on notice as to what is proscribed conduct. As a result, the canon intrudes on legitimate free speech.

On March 18, 2002, Judge Griffen, who is African-American, appeared before the Arkansas Legislative Black Caucus in a public meeting called to discuss the recent dismissal of University of Arkansas at Fayetteville (University) basketball coach, Nolan Richardson. At that meeting, Judge Griffen first introduced himself:

> My name is Wendell L. Griffen. I am a native Arkansan, grew up near Delight in Pike County, and now live in Little Rock with my wife (Dr. Patricia L. Griffen) and our two teenage sons. Since January 1, 1996, I have served on our state Court of Appeals. Before then, I practiced law in Little Rock and served briefly as Chairman of the Workers' Compensation Commission (from April 15, 1985 to

February 2, 1987). I am also an ordained Baptist minister serving as Coordinator of Educational Ministries at Mt. Pleasant Baptist Church in Little Rock.

He next described his educational background at the University in college and law school and his involvement with the University since graduation, including his presidency of the Black Alumni Society of the Arkansas Alumni Association.

Following this introduction, Judge Griffen traced African-American enrollment at the University since 1948. He discussed what he described first as the absence and later the low percentage of black faculty. He next voiced his concern about black student recruitment, reduced black student enrollment, reduced financial aid to black students, the absence of black full professors, and the absence of black chairs of departments. He then discussed Coach Nolan Richardson and his firing despite his record of having the highest won-loss record in University basketball history. Because of these facts, Judge Griffen called upon the legislators to engage in economic retaliation during the legislative session:

> Please weigh these facts alongside what will, no doubt, be similar to patterns at other state-supported schools of higher education in Arkansas. Bear in mind that these colleges and universities operate with tax dollars taken from hard working citizens of all races and ancestries. Our citizens are still paying, financially, emotionally, academically, and culturally, for inequities in public secondary education that followed the curse Governor Faubus left on our state. In the coming weeks and months, you will be approached by leaders from these schools and their supporters. They will urge you to appropriate more tax revenue for their institutions. Do not reward the captains of colleges and universities with personnel actions, admission standards, and institutional practices and policies that exclude, inhibit, and mistreat black students, faculty, staff, and citizens by appropriating more tax revenue to their schools. Previous appropriations have been used to maintain longstanding inequities, so use your appropriation votes to show that you will not be a willing accomplice to that injustice. As legislators, cast your votes on budget appropriation bills to send a clear signal to the University of Arkansas and other schools. Show them you will not support schools where black students, professors, and staff members are forced to watch their opportunities in higher education languish while their white counterparts enjoy most favored status at state expense.

Chancellor White and Frank Broyles say they fired Coach Richardson because they lack confidence in his leadership, despite the successful results he produced over the past seventeen years. Whether you believe them or not—and I do not believe them— send them a budgetary vote of no confidence concerning sorry leadership about racial inclusion over the past 130 years at the University of Arkansas. SHOW THEM THE MONEY! [Emphasis omitted.]

In 2002, the Judicial Commission received three complaints against Judge Griffen relating to his public comments:

(1) On March 3, 2002, an email was sent from a named complainant objecting to Judge Griffen's comment that "People of color want to send their children to places where they will have strong positive role models." The statement was made in conjunction with the University's dismissal of basketball coach, Nolan Richardson. The complainant stated that positive role models are wanted by all races and that Judge Griffen had turned this into a "racist situation." The complaint became Case No. 02-161.

(2) On March 29, 2002, a named complainant wrote a handwritten letter to the Judicial Commission, also complaining about Judge Griffen's "people of color" remarks in connection with the University. The complainant charged that Judge Griffen "expressed racist views" and "votes in line to his racist views" on the court of appeals. This became Case No. 02-091.

(3) On April 8, 2002, the Judicial Commission received a four-page letter written by an anonymous complainant, who complained about Judge Griffen's appearance before the Arkansas Black Legislative Caucus on March 18, 2002, and subsequent radio programs. The letter listed Judge Griffen's actions in (a) writing a letter from the University of Arkansas Black Alumni Society that complained about the University's decision to terminate Coach Richardson; (b) a quote by Judge Griffen in *USA Today*, stating that race was a factor in the Richardson firing; (c) Judge Griffen's letter to the University withdrawing all of his recruiting and fundraising support because of the demotion of a black administrator at the University; and (d) other comments about the University's lack of commitment to racial diversity. The letter pointed to violations by Judge Griffen of Canon 2 and Canon 4 of the Arkansas Code

of Judicial Conduct. The anonymous complainant also alluded to a questionable dissent written by Judge Griffen in a court of appeals case and other public statements he had made, which exhibit his "outspokenness." The writer called on the Judicial Commission to investigate Judge Griffen for "unethical and improper conduct." This became Case No. 02-197.

By letter dated April 17, 2002, the Judicial Commission advised Judge Griffen of the complaints and the asserted violations of the canons and suggested that Judge Griffen also review Canons 3B(5) and 4C(1) of the Arkansas Code of Judicial Conduct. The Judicial Commission requested any comments from Judge Griffen within thirty days.

On May 10, 2002, Judge Griffen wrote to the Judicial Commission and denied any impropriety or violation of the canons. He discussed each canon raised by the Judicial Commission and wrote regarding Canon 4C(1):

> Had the complainant bothered to study the newspaper article that reported that appearance [before the Legislative Black Caucus], he or she would have learned that I appeared in my own capacity, that I am an alumnus of the University of Arkansas, past president of the Black Alumni Society of the Arkansas Alumni Association, and past board member of the Arkansas Alumni Association. I disclosed those facts at the outset of my remarks and indicated that I was appearing on my own behalf.

Judge Griffen concluded by urging the Judicial Commission not to lend its office in support of tactics aimed at "chilling legitimate involvement by judges in issues of public interest."

By letter dated July 17, 2002, the Judicial Commission advised Judge Griffen that it was proceeding to investigate his conduct and enclosed a Statement of Allegations, which enumerated the canons in question:

- Canon 2A: "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

- Canon 2B: "A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others . . . ."

- Canon 3B(5): "A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race . . . ."

- Canon 4A: "A judge shall conduct all of the judge's extra-judicial activities so that they do not: (1) cast reasonable doubt on the judge's capacity to act impartially as a judge . . . ."

- Canon 4C(1): "A judge shall not appear at a public hearing before, or otherwise consult with, an executive or legislative body or official except on matters concerning the law, the legal system or the administration of justice or except when acting pro se in a matter involving the judge or the judge's interests."

The statement of allegations further set out the conduct subject to investigation, including Judge Griffen's appearance before the Legislative Black Caucus on March 18, 2002, but also Judge Griffen's comments relating to Coach Richardson's firing, which appeared in the *Arkansas Times*, *USA Today*, *New York Times*, and the *Arkansas Democrat-Gazette*. The relevant newspaper articles were attached. An answer was requested from Judge Griffen within twenty days.

On September 9, 2002, counsel for Judge Griffen wrote a lengthy response to the Judicial Commission in which each alleged violation was answered. With respect to Canon 4C(1), counsel wrote that racial diversity at the University was a matter of "heartfelt interest" to Judge Griffen and that he had spoken to the Legislative Black Caucus "for himself and his interests, not as an appellate judge in the Arkansas court system." The question, counsel asserted, is one of free speech and whether it is proper to curb Judge Griffen's outspokenness. Counsel concluded that to infringe on Judge Griffen's free speech would be "extremely hazardous," and asked the Judicial Commission to dismiss the complaints.

On September 20, 2002, the Judicial Commission wrote to Judge Griffen's counsel and advised that it had dismissed two complaints (No. 02-161 and No. 02-191) but had found sufficient reason to proceed with a Probable Cause Determination on No.

02-197, the anonymous complaint.[1] The Judicial Commission said the hearing for that determination would concern Judge Griffen's appearance before the Legislative Black Caucus, which allegedly violated Canon 4C(1). The Judicial Commission further said it had "found" that Judge Griffen's comments about Coach Richardson and the University showed a lack of impartiality and violated Canon 4A.[2] The Judicial Commission did not find sufficient cause to proceed with a probable-cause determination regarding the alleged violations of Canons 2A, 2B, and 3B(5).

On September 24, 2002, counsel for Judge Griffen responded and took issue with the Judicial Commission's finding that Judge Griffen had violated Canon 4A. Counsel further asked for discovery prefatory to the Probable Cause Determination.

On November 15, 2002, a hearing to determine probable cause took place before the Judicial Commission. Professor Mort Gitelman from the University of Arkansas Law School at Fayetteville testified for Judge Griffen. He informed the Judicial Commission about First Amendment law as it affects judges and their ability to speak out on matters of public interest. State Senator Tracy Steele also testified for Judge Griffen and advised the Judicial Commission that the Legislative Black Caucus is an "informal organization" that invited Judge Griffen to speak to give his "expert opinion." Dr. William J. Shaw next testified for Judge Griffen and told the Judicial Commission that black preachers like Judge Griffen have a duty to speak out on matters of "personal private morality" but also "institutional practices" that "have to do with equity and justice."

Judge Griffen testified on his own behalf and stated that his comments before the Legislative Black Caucus did not violate the canons but were expressly permitted under the Judicial Code as a "matter of the judge's interest." He admitted to being outspoken in matters of race and to criticizing the University for its failure to advance black professors. But he contended that this in no way impaired his service as a judge as he was speaking *pro se* and not

---

[1] One Commissioner, Judge Leon Jamison, voted against proceeding with a Probable Cause Determination.

[2] According to the record, the Judicial Commission determined at its preliminary meeting that Judge Griffen had violated Canons 4A and 4C(1) and, as such, determined that there was enough evidence to warrant further consideration of the matter at a Probable Cause Determination.

using his judicial office to influence legislative opinion. The Judicial Commission presented no witnesses.

After the hearing, the Judicial Commission left the room to deliberate. When it returned, it dismissed all allegations that Judge Griffen had violated the canons except the allegation concerning Canon 4C(1).[3] By a vote of four-to-three, the Judicial Commission voted to issue an admonishment to Judge Griffen for violating that canon.

On November 20, 2002, the Judicial Commission issued a Letter of Admonishment, which read in part:

> The complaint, which was filed by an anonymous complainant, alleged, *inter alia*, that you appeared before the Legislative Black Caucus of the Arkansas General Assembly at a public hearing that was held March 18, 2002. Subsequent investigation of that complaint revealed that your testimony at that hearing did not concern the law, the legal system or the administration of justice. In addition, your appearance was not in connection with a matter involving yourself or your interests as contemplated by Canon 4(C)(1) of the Code of Judicial Conduct.

> The Judicial Discipline & Disability Commission found that your appearance before the Legislative Black Caucus on March 18, 2002 was in contravention of Canon 4(C)(1) of the Code of Judicial Conduct. For your conduct in violating the Code of Judicial Conduct, it was the decision of the Commission that you be admonished. This public admonition constitutes adequate discipline and no further action is warranted. This Commission action is public information.

On December 16, 2002, Judge Griffen filed a complaint for declaratory and injunctive relief in federal district court. In that complaint, Judge Griffen challenged the constitutionality of the Judicial Commission's issuance of a Letter of Admonishment. In its subsequent Memorandum Opinion and Order dated May 31, 2003, the federal district court referred to the "deafening silence coming from the Commission and the Arkansas Supreme Court"

---

[3] This court assumes that when the Judicial Commission dismissed "all allegations," this included dismissal of the allegation that Judge Griffen violated Canon 4A. As previously stated, the Judicial Commission had not found sufficient cause to proceed to a probable-cause determination regarding alleged violations of Canons 2A, 2B, and 3B(5).

concerning review of Judge Griffen's admonishment and his constitutional claims.[4] The federal district court then dismissed Judge Griffen's claims without prejudice on the basis that it had no jurisdiction over the constitutional issue and that, accordingly, the matter should be left in the hands of the Arkansas Supreme Court. *See Griffen v. Arkansas Judicial Discipline and Disability Com'n*, 266 F. Supp. 2d 898 (E.D. Ark. 2003).

On June 12, 2003, Judge Griffen filed his Petition for Writ of *Certiorari* with this court. In that petition, Judge Griffen prayed for various forms of relief, including that this court declare the Letter of Admonishment invalid and quash it. On June 23, 2003, the Judicial Commission filed the Administrative Record with our Supreme Court Clerk. That record included a Report from the Judicial Commission to this court as required by Rule 12A of the Rules of Procedure of the Arkansas Judicial Discipline and Disability Commission. That Report related to the violation of Canon 4C(1) and contained these findings:

1. Wendell L. Griffen is a judge on the Arkansas Court of Appeals.

2. On March 18, 2002, Judge Griffen appeared before the Legislative Black Caucus of the Arkansas General Assembly during a public hearing at which he testified.

3. The Legislative Black Caucus is part of a legislative body, the Arkansas General Assembly.

4. Judge Griffen testified about "inequities in higher education in our state," a matter of personal concern to him. A copy of Judge Griffen's remarks to the Legislative Black Caucus is attached to this report as "Attachment E." Judge Griffen's testimony did not concern the law, the legal system or the administration of justice. Judge Griffen's appearance was not in connection with a matter involving himself or his interests.

---

[4] Rule 12F of the Rules of Procedure of the Arkansas Judicial Discipline and Disability Commission provides that this court *may* bring up a matter for review on *certiorari*. It has been the practice of this court only to review such matters upon petition by the disciplined judge.

## I. Violation of Canon 4C(1)

### a. Standard of Review

■ Judge Griffen first contends that the Judicial Commission erred in finding that his comments to the Arkansas Legislative Black Caucus violated Canon 4C(1). We begin by establishing our standard of review. That standard is found in our Rules of Procedure of the Arkansas Judicial Discipline and Disability Commission, which references our "review of the entire record." Rule 12E. Rule 12E goes further and says this court "may accept, reject, or modify in whole or in part, the findings and recommendations of the Commission." *Id.*

■ In *Judicial Discipline & Disab. Comm'n v. Thompson*, 341 Ark. 253, 16 S.W.3d 212 (2000), we acknowledged Rule 12E and our *de novo* review, but we added that we would not reverse the Judicial Commission's findings unless they were clearly erroneous. In a recent case involving judicial discipline, we limited our review under *certiorari* to errors appearing on the face of the record. *Huffman v. Arkansas Judicial Disc. and Disab. Comm'n*, 344 Ark. 274, 42 S.W.3d 386 (2001).

### b. Legislative Body

■ We turn then to the language of Canon 4C(1) itself. That canon reads in full:

> C. Governmental, Civic or Charitable Activities.
>
> (1) A judge shall not appear at a public hearing before, or otherwise consult with, an executive or legislative body or official except on matters concerning the law, the legal system or the administration of justice or except when acting pro se in a matter involving the judge or the judge's interests.

In examining our judicial canons as in the case of examining our statutes, we give the words their ordinary and usually accepted meaning. *Huffman v. Arkansas Judicial Disc. and Disab. Comm'n, supra.*

■ Both parties in this matter wax eloquent on whether the Legislative Black Caucus is a "legislative body" under Canon 4C(1). The Judicial Commission in its Report to this court specifically found that the caucus was "part of a legislative body."

We believe, however, that this issue is not determinative of whether Canon 4C(1) applies, because Canon 4C(1) also speaks in terms of consulting with a legislative *official*. Without question, the Legislative Black Caucus is made up of legislative officials irrespective of whether it is a legislative body. We have no doubt that Judge Griffen was consulting with legislative officials when he made his appearance before the caucus on May 18, 2002. As a result, we modify the Judicial Commission's findings in its Report to refer to consultation with legislative officials, as we are empowered to do under Rule 12E of the Judicial Rules.

*c. History of Canon 4C(1)*

In an attempt to illuminate the history and purpose of Canon 4C(1), we have traced its evolution in Arkansas since the Canons of Judicial Ethics were first adopted by this court in 1963. *See Canons of Judicial Ethics*, 237 Ark. Appx. 997 (1963). Those early canons contain no prohibition against judges consulting with an executive or legislative official. However, those canons did provide that judges could advise those in authority to remedy defects in procedure relating to the practice of law.

In 1972, the American Bar Association published its Model Code of Judicial Conduct and in 1973, this court adopted it. *See In Re: Arkansas Code of Judicial Conduct*, 255 Ark. Appx. 1075 (1973). Both the ABA's Model Code and the Judicial Code adopted by this court in 1973, contained the following canon as Canon 4B:

> B. He [the judge] may appear at a public hearing before an executive or legislative body or official on matters concerning the law, the legal system, and the administration of justice, and he may otherwise consult with an executive or legislative body or official, but only on matters concerning the administration of justice.

There was no exception for consultation concerning *pro se* matters involving the judge's interests.

By *per curiam* order in 1988, this court readopted the Judicial Code with minor amendments. *See In Re: The Arkansas Code of Judicial Conduct*, 295 Ark. 707, 749 S.W.2d LXV (1988). In this Judicial Code, Canon 4B remained the same. There was no exception for a *pro se* matter involving the judge's interests.

In 1993, this court adopted a new Code of Judicial Conduct that followed, in most respects, a new Model Judicial Code published by the American Bar Association in 1990. *See Code of Judicial Conduct*, 313 Ark. Appx. 737 (1993). In this Judicial Code, Canon 4C(1) appears for the first time in its current form and includes the exception for consultation with executive or legislative officials on *pro se* matters involving the judge's interests. The sole commentary to this new canon refers back to Canon 2B "regarding the obligation to avoid improper influence."

*d. Purpose of Canon 4C(1)*

██ We have no doubt that the purpose behind Canon 4C(1) and its predecessor, Canon 4B, is to preserve judicial independence from the executive and legislative branches of government. Judges who lobby either branch of government on matters other than the administration of justice necessarily thwart that purpose. To that end, the improper use of the prestige of the judicial office must be avoided, and the commentary to Canon 2B to which the commentary to Canon 4C(1) refers us makes this abundantly clear. In a similar vein, the Arkansas Constitution assures the separation of powers among the three branches of government by providing that each branch is a separate department and that no person in one department shall exercise a power belonging to either of the other departments. See Ark. Const. art. 4, §§ 1 and 2. The public policy in our canons and the Arkansas Constitution is radiantly clear. Judicial independence is a hallmark of our system of government, and we cannot abide the entanglements between the judicial and other branches of government to which lobbying executive and legislative officials would unquestionably lead.

██ We hold that judicial independence is a fundamental principle to which the people of this state and the members of this court have subscribed. We have no hesitancy in adding that judicial independence is a compelling interest of the State. We cannot and will not countenance a blurring of the judge's role with that of the executive or legislative branches.

██ Canon 4C(1) also seeks to avoid improper use of judicial prestige. Under the Commentary to Canon 2B, which applies also to Canon 4C(1), examples of improper use of judicial prestige are given:

- gaining deferential treatment from a police officer following a traffic stop.

- using judicial letterhead for a personal or economic advantage.

- advancing the private interests of others such as gaining judicial advantage in a civil suit for a member of the judge's family.

- letters of recommendation to a sentencing judge on behalf of a defendant without an official request.

The clear message here is that such improper use is unethical. A judge can never divest himself or herself from being a judge. Once installed into office, the status of judge is indelibly imprinted on that person from that time forward.

### e. Judicial Interests

Were we dealing with Canon 4C(1) as it was written from 1973 to 1993 as Canon 4B, we would affirm the Judicial Commission in admonishing Judge Griffen. But in 1993, we added a new exception. This court is now called on to interpret the meaning of the second exception to Canon 4C(1), which reads: "except when acting *pro se* in a matter involving the judge or the judge's interests." Surely this second exception means other interests than matters dealing with the administration of justice, which is the first exception. But what does it mean?

The parties before us are galaxies apart in their respective interpretations. Judge Griffen advances the theory that the exception means what it says and that a judge may consult with a legislator on *any* matter of interest to that judge. That interpretation, however, would mean that the exception would swallow the rule, and the rule would be meaningless. Clearly, a judge would not be consulting with a legislator on a matter that was not of interest to that judge. We will not engage in an absurd interpretation of our statutes, rules, or canons. *Green v. Mills*, 339 Ark. 200, 4 S.W.3d 493 (1999) ("This court does not engage in interpretations that defy common sense and produce absurd results"). We discard Judge Griffen's interpretation as unreasonable and unworkable.

The Judicial Commission, on the other hand, posits the theory that a judge's interests must be defined narrowly to mean only proprietary or pecuniary interests. For support, it turns to a dissenting opinion in *Worth v. Benton County Circuit Court*, 351 Ark. 149, 89 S.W.3d 891 (2002), where the dissenting justice defined a judge's economic interest in the case of disqualification under Canon 3 as "a personal proprietary or pecuniary interest or one affecting the individual rights of the judge." 351 Ark. at 165, 89 S.W.3d at 901 (Glaze, J. dissenting). The issue in *Worth*, of course, involved the extent of a judge's economic interest in a proceeding that would cause that judge's impartiality to be questioned.

In the instant case, however, the issue is different. The question now before us is what issues of interest to a judge can be discussed with a legislator. The Judicial Commission urges that such issues of interest should be limited purely to economic interests of the judge. If that interpretation is correct, we question whether, apart from budgeting matters pertaining to judicial salaries and the like, it is desirable for judges to lobby legislators or executive officials about personal matters such as their taxes, their farms, or their insurance policies, all of which are matters of pecuniary interest. Would not such a practice lead to the very entanglements with the other branches of government that Canon 4C(1) seeks to avoid?

Judge Griffen emphasizes the *"pro se"* language of the exception and contends that as long as he is acting for himself, and not as a judge, the exception pertains. Yet, as already referenced in this opinion, we cannot sanction an interpretation of the canon that allows a judge to assume protean identities, which can be changed at will. We reiterate that we are firmly convinced that a judge never sheds the judicial role so long as he or she remains in office.

Still, we are left with the dilemma of what the "judge's interests" exception means. The Judicial Commission admits there are no cases interpreting the scope of this exception. Indeed, we have found only one state, Alaska, that includes Commentary under its Canon 4C(1), which provides guidance on how to interpret "judge's interests." That commentary reads:

> Section 4C(1) permits a judge to appear before a governmental body or government official on a matter concerning the judge's interest. The word "interests" should be interpreted broadly. A judge

may speak on matters concerning the judge's social interests as well as matters affecting the judge's economic interests.

The Alaskan interpretation, of course, falls more in line with Judge Griffen's theory of the case.

We have sought to ascertain why the American Bar Association added the "judge's interests" exception to its Model Judicial Code in 1990. We have discovered only one Reporter's Explanation note regarding the added amendment to Canon 4C(1) in the Model Code. That note related to the Final Draft dated November 1989 and reads: "An additional exception was added for other activities under this rule that are permitted elsewhere by this Code." American Bar Ass'n Standing Comm. on Ethics & Prof'l Responsibility, *Report to the House of Delegates* 35 (Nov. 1989).

Judge Griffen fervently maintains that other canons in our Judicial Code permit him to speak out on non-legal subjects such as racism at the University. He refers us specifically to Canon 4B:

B. Avocational Activities. A judge may speak, write, lecture, teach on and participate in other extra-judicial activities concerning the law, the legal system, the administration of justice and non-legal subjects, subject to the requirements of this Code.

He urges that what he was doing before the Legislative Black Caucus was speaking on a non-legal subject, which constituted one of his interests, that is, racial discrimination at the University. He further maintains that he never sought to influence the legislators by virtue of his power as a judge.

When we consider the various arguments and interpretations made by the Judicial Commission and Judge Griffen, we are convinced that the "judge's interests" exception in Canon 4C(1) is not clear. Without question, it provided no standard or test to govern Judge Griffen's conduct in speaking before the Legislative Black Caucus. Just this year, this court described the appropriate test to invoke in examining a claim of vagueness:

For a statute to avoid being vague, it must give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden and it must not be so vague and standardless that it leaves

judges free to decide, without any legally fixed standards, what is prohibited and what is not on a case-by-case basis. *Thompson v. Arkansas Social Servs.*, 282 Ark. 369, 669 S.W.2d 878 (1984). The subject matter of the challengèd law also determines how stringently the vagueness test will be applied. For instance, if the challenged law infringes upon a fundamental right, such as liberty or free speech, a more stringent vagueness test is applied; in contrast, however, if the law merely regulates business activity, a less stringent analysis is applied and more flexibility is allowed. *Craft, supra* (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 102 S. Ct. 1186, 71 L.Ed.2d 362 (1982)). A statute is not to be struck down as vague only because marginal cases could be put where doubts might arise. *Thompson, supra* (citing *Davis v. Smith*, 266 Ark. 112, 583 S.W.2d 37 (1979)).

*Holloway v. Arkansas State Bd. of Architects*, 352 Ark. 427, 436-37, 101 S.W.3d 805, 811-12 (2003). Applying the *Holloway* discussion of vagueness to the instant case, we conclude that without some standard or guidance in Canon 4C(1) about what is a proper interest of a judge for comment, Judge Griffen had no fair notice of what conduct was prohibited when he addressed the Legislative Black Caucus. Moreover, as we said in *Holloway*, when free speech is involved, a more stringent vagueness test is applied. We hold that the "judge's interests" exception is vague and unclear.

*f. Judicial Free Speech*

We turn next to the issue of judicial free speech and the recent United States Supreme Court decision of *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002). With its decision in *Republican Party of Minnesota v. White, supra,* the United States Supreme Court changed the landscape for judicial ethics, at least with respect to political campaigns. The issue in *White* was whether a judicial candidate could announce his views in a political campaign on disputed legal or political issues. For a candidate to do so directly violated the canons of judicial conduct contained in Minnesota's Judicial Code. The judicial candidate involved, however, complained that this restriction curtailed his freedom of speech under the First Amendment.

The Court agreed that the canon violated the First Amendment. It established that the proper test for determining the constitutionality of the restriction was strict scrutiny and said:

> Under the strict-scrutiny test, respondents have the burden to prove that the announce clause is (1) narrowly tailored, to serve (2) a compelling state interest. *E.g., Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 222, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989). In order for respondents to show that the announce clause is narrowly tailored, they must demonstrate that it does not "unnecessarily circumscrib[e] protected expression." *Brown v. Hartlage*, 456 U.S. 45, 54, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982).

*White*, 536 U.S. at 774-75.

The Court concluded that the announce clause was not narrowly tailored to serve the impartiality of the judiciary or the appearance of impartiality. The Court further concluded that the impartiality of judges "may well be an interest served by the announce clause, but it is not a *compelling* state interest, as strict scrutiny requires." *White*, 536 U.S. at 777 (emphasis in original).

The Judicial Commission seeks to distinguish *White* on the grounds that it involved only a judicial candidate and a different canon than what we are concerned with in the instant case. That is true, and the ripple effect of the *White* decision has yet to be determined. Some states have been reluctant to read *White* broadly. *See, e.g., In the Matter of William Watson*, 100 N.Y.2d 290, 794 N.E.2d 1, 763 N.Y.S.2d 219 (2003) (*per curiam*) (judicial candidate's comments to help law enforcement if elected violated the pledges or promises prohibition in the New York Rules Governing Judicial Conduct); *In re Patricia Kinsey*, 842 So. 2d 77 (Fla. 2003) (judicial candidate's comments that she would favor law enforcement, if elected, violated the pledges or promises canon of the Florida Code of Judicial Conduct). We do not view the *White* decision as controlling precedent for the case at hand.

Nevertheless, it is crystal clear from *White* and previous cases that the strict-scrutiny test must be applied in cases such as we have before us in which a fundamental right such as free speech is circumscribed. *See, e.g., Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995) (restriction on commercial free speech must be narrowly tailored to achieve the desired objective). The Judicial Commission agrees that strict scrutiny is the proper analysis but simply argues that the tests of compelling state interest and narrow tailoring have been met. We have already established in this opinion that safeguarding an independent judiciary as contem-

plated by Canon 4C(1) is a compelling state interest. But that does not answer the question of whether Canon 4C(1) is narrowly tailored as required under the strict-scrutiny analysis. We are convinced that the Judicial Commission has not met its burden of showing that Canon 4C(1) with the standardless "judge's interests" exception was sufficiently tailored so as not to restrict legitimate free speech. Indeed, as we have already held in this opinion, the "judge's interests" exception in Canon 4C(1) is vague and standardless. This failure to tailor Canon 4C(1) narrowly implicates the First Amendment and is an additional reason for reversal.

A word about the dissents. The dissents of Justices Corbin and Hannah are full of passionate intensity and conclude that the majority, with this opinion, "has failed not only the judiciary but also the citizens of this state." Boiled down to its essence, the arguments of the dissenters are (1) Canon 4C(1) is clear to them; (2) this court adopts the canons, so they must be clear; and (3) even if Canon 4C(1) is not clear, Judge Griffen's conduct was so egregious that it must be a violation. What the dissents fail to address is Judge Griffen's argument that Canon 4B allows judges to speak on non-legal matters subject to the requirements of the Judicial Code. Nor do the dissenters concern themselves with the First Amendment and the fact that Canon 4C(1) with the standardless "judge's interests" exception is neither sufficiently defined nor narrowly tailored so as not to restrict legitimate free speech. The dissenters essentially proclaim that they know a violation when they see one but offer no guidance on how to extend that special knowledge to others. Without that guidance, we are at a loss to know when a judge can lobby members of the General Assembly *pro se* about a matter of personal interest. We simply cannot tell from Canon 4C(1).

Of course, this court is forever amending its Rules of Professional Conduct, its Rules of Criminal Procedure, its Rules of Civil Procedure, its Rules of Evidence, and so forth in an effort to update those rules but also to bring better clarity. And that is precisely what needs to be done with Canon 4C(1).

We perceive that our overarching duty on this court is to follow the law. This includes adherence to the cornerstone principles of adequate notice of what constitutes impermissible conduct and closely defined parameters when infringement on free speech is involved. Both principles are interwoven in this case and

determine its outcome. Far from failing the judiciary and the people of this state with this opinion, we have done exactly what is expected of us.

A third dissenter, Justice Glaze, posits that this court·has the power to revive an alleged violation of Canon 2B when the Judicial Commission determined before the probable-cause hearing that there was insufficient cause to proceed to a probable-cause determination regarding violation of that canon. The dissenter would decide the matter here on *de novo* review, or send it back for another hearing and decision. He concludes that he would affirm the admonishment for violation of Canon 2B. He advances this notion as an option even though the Arkansas Constitution expressly provides that it is the Judicial Commission that may "initiate" and shall receive and investigate complaints pertaining to "misconduct" of judges. Ark. Const. amend. 66(b). In the instant case, as a result of a letter written by an anonymous complainant, the Judicial Commission's Executive Director prepared a Statement of Allegations.

Amendment 66 to the Arkansas Constitution mandates this court to create procedural rules to implement that amendment. Ark. Const. amend. 66(f). In response, this court adopted the Rules of Procedure of the Arkansas Judicial Discipline and Disability Commission, which give this court plenary power to accept, reject, or modify findings and recommendations of the Judicial Commission. *See* Rule 12E. Yet, that power applies solely to complaints received by the Judicial Commission and formal allegations or charges that have ·been brought by the Judicial Commission. Neither the Rules nor Amendment 66 empower this court to bring formal charges or resuscitate allegations for violations not found to warrant further investigation.

The Rules, in fact, provide for commencement of the case by the filing of either a sworn complaint or a formal statement of allegations prepared by the Executive Director. *See* Rule 8E. As stated earlier, the Executive Director filed formal allegations in the instant case. Amendments to those formal allegations are allowed after commencement of a public hearing "only if the amendment is technical in nature and if the judge and his counsel are given adequate time to prepare a response." Rule 11E. If a majority of the Judicial Commission recommends no discipline, "the case shall be dismissed." Rule 11I.

The power of this court to remand to the Judicial Commission for additional findings pertains to the Judicial Commission's Report and specifically to "the recommendation for discipline or sanction to be imposed." Rule12C. Again, there is nothing in the Rules granting this court the authority to bring formal charges or to breathe new life into an allegation that the Judicial Commission has already found not to warrant further investigation. That authority lies solely within the province of the Judicial Commission.

The dissent also mentions Rule 12F of the Procedural Rules, which provides that this court may bring up for review any action or failure to act by the Judicial Commission. Rule 12F, of course, merely implements Amendment 66, and that constitutional amendment, to repeat, manifestly provides that it is the Judicial Commission that shall receive and investigate complaints and may initiate allegations and charges. A harmonious reading of our Procedural Rules with our Constitution requires that the "action" alluded to in Rule 12F is to any violation of the canons and any sanction imposed by the Judicial Commission as a result of that violation. The failure to act refers to failure to investigate a complaint against a judge—not to insufficient or dismissed allegations or charges. The dissent seeks to resurrect an allegation not found to be sufficient by the commission, which has the effect of initiating a new allegation. That runs directly contrary to Amendment 66.

It is also contrary to our caselaw. In *Commission on Judicial Discipline & Disability v. Digby*, 303 Ark. 24, 792 S.W.2d 594 (1990), we clarified in no uncertain terms that because the Judicial Commission is created by constitutional amendment, it is not an arm of the Supreme Court and differs from our Committee on Professional Conduct in that respect. In addition, we made it clear that Amendment 66 only authorized the Supreme Court to adopt procedural rules "but no general authority was conferred on this court to supervise the Commission." 303 Ark. at 27, 792 S.W.2d at 594. Regarding Rule 12F, we said "this court has provided that it may bring before it any action or failure to act on the part of the commission *with respect to a case before the commission*." *Id*. (Emphasis added.) An allegation not found to be based on sufficient cause indisputably is not a case pending before the Judicial Commission.

■    We concluded our opinion in *Digby* by emphasizing that the Judicial Commission "is a constitutional entity separate from this court," and we compared it to the State Highway Commission and to the Arkansas State Game and Fish Commission in stressing its independence. It is patently clear that the power to make allegations and bring charges against judges or to overrule the Judicial Commission on its decision not to pursue allegations is authority that does not abide in this court.

Apart from the fact that the Arkansas Constitution, our procedural rules, and our caselaw do not allow this, were we to revive an allegation at the appellate level, we would be whipsawing Judge Griffen (1) with an allegation previously not found to be sufficient which was not briefed as an issue by either party on appeal, and (2) with the actual violation and sanction pending before this court on appeal. This we will not do.

Even though the Judicial Commission "dismissed" all allegations at the end of the probable-cause determination, the only violation still under investigation at that time, other than a violation of Canon 4C(1), was a violation of Canon 4A. Allegations relating to Canon 2B had previously been found to be insufficient. For these reasons, we will not decide this matter on *de novo* review and revive an allegation.

### Conclusion

No doubt Judge Griffen's outspoken conduct was offensive to some, including the complainants. Without question, there are varying opinions regarding the propriety of Judge Griffen's remarks. The issue, though, is whether his comments constitute an ethical violation, leading to punishment. Without a standard established in the "judge's interests" exception to Canon 4C(1) to guide Judge Griffen on what is a proper area of comment to the legislative officials, we are hard-pressed to find a violation of the canon. And without proof of a "narrow tailoring" of the exception by the Judicial Commission when the parameters of speech based on conduct are directly involved, Canon 4C(1), as applied to Judge Griffen, violates his First Amendment rights.

■    Accordingly, because the exception relating to a judge's interests is vague and indefinite and is not narrowly tailored so as to avoid an infringement on free speech, we hold that the Judicial Commission clearly erred in its finding regarding Judge

Griffen's interests, and we grant the petition for writ of *certiorari* and quash the admonishment. Because we decide this matter as we do, there is no need to address Judge Griffen's other reasons for granting the writ.

We do, however, take this opportunity to encourage the Judicial Commission to study the "judge's interests" exception to Canon 4C(1) and provide its recommendations to this court for a proper amendment or additional commentary, which will set in place a proper standard to govern this conduct.

Writ granted.

GLAZE, CORBIN, and HANNAH, JJ., dissent.

TOM GLAZE, Justice, dissenting. I disagree with the majority opinion. The Commission's decision to issue an admonishment should be upheld, but the sanction should be for Judge Griffen's having violated Canon 2(B), which, in relevant part, provides that a judge "shall not lend the prestige of judicial office to advance the private interests of . . . others." During oral argument, the Judge's counsel conceded that lobbying for someone else is a violation of the canons; however, counsel did not believe Judge Griffen's actions in this matter amounted to judicial misconduct. At the end of the probable cause hearing, the Commission dismissed all allegations (including those founded on Canon 2(B)) except those concerning Canon 4(C)(1).

While I do not take issue with the Commission's ruling that Judge Griffen violated Canon 4(C)(1), the record clearly reflects that he violated Canon 2(B). The Legislative Black Caucus called its meeting because Coach Nolan Richardson had been terminated by Chancellor John A. White and Athletic Director Frank Broyles. This controversy not only gave impetus for the Black Caucus to call a meeting, but also led the Caucus to invite leading state officials to attend and present their views on the brouhaha concerning Coach Richardson's legal problems with the University of Arkansas. Judge Griffen's prepared remarks speak for themselves. One relevant part of his remarks follows:

> In the coming weeks and months, you will be approached by leaders from these schools and their supporters. They will urge you to appropriate more tax revenue for their institutions. Do not reward the captains of colleges and universities with personnel

actions, admission standards, and institutional practices and policies that exclude, inhibit, and mistreat black students, faculty, staff, and citizens by appropriating more tax revenue to their schools. Previous appropriations have been used to maintain longstanding inequities, so use your appropriation votes to show that you will not be a willing accomplice to that injustice. *As legislators, cast your votes on budget appropriation bills to send a clear signal to the University of Arkansas and other schools.* Show them you will not support schools where black students, professors, and staff members are forced to watch their opportunities in higher education languish while their white counterparts enjoy most favored status at state expense. *Chancellor White and Frank Broyles say they fired Coach Richardson because they lack confidence in his leadership, despite the successful results he produced over the past seventeen years. Whether you believe them or not — and I do not believe them —* send them a budgetary vote of no confidence concerning sorry leadership about racial inclusion over the past 130 years ·at the University of Arkansas. SHOW THEM THE MONEY! (Emphasis added.)

Although Judge Griffen's position is that his appearance and remarks pertained mainly to diversity and racial issues over 130 years at the University of Arkansas, he took the added license and opportunity to mention Coach Richardson a minimum of eighteen times in his speech, and in doing so, Judge Griffen drove home the message to the legislators attending the Caucus meeting that they should take action and obtain results by limiting or stopping altogether money to state officials and leaders by "letting the money flow according to the results they show." Judge Griffen's rush to Coach Richardson's aid was most admirable as a friend, but not as a judge who is ethically forbidden to use his position to gain some advantage on behalf of a friend who finds himself in a legal controversy. This is true whether or not the judge would or could be a presiding judge over the legal dispute. There is nothing vague about Canon 2(B); as conceded by counsel in oral argument, using the prestige of the Judge's office to advance the private interests of another violates this Canon. A judge cannot rectify such a breach of Canon 2(B) merely by announcing before his speech that, besides being a judge, he also wears other "hats."

Our court's procedural rules that implement Amendment 66 to the Arkansas Constitution, entitled "Judicial Discipline and Disability Commission," are *sui generis* and expressly give this court the authority and the right to review any action taken upon any

complaint filed with the Commission, and the court may also bring up for review any case in which the Commission has failed to act. Given this authority of review, this court can clearly decide this case *de novo* and declare that Judge Griffen violated Canon 2(B); or the court has the option to remand the matter to the Commission to relitigate the law and evidence bearing solely on Canon 2(B). Because this matter has already been developed, I would decided this Canon 2(B) issue in this *de novo* review.

To summarize, this court is availed the procedural authority to review judicial discipline matters filed with the Commission under Ark. Const. amend. 66(c) and (f), and in accordance with Ark. Code Ann. § 16-10-401 to -411 (Repl. 1999), and Ark. Jud. Disc. & Disab. Comm'n R. 1 through 14. In particular, Rule 12 provides in relevant part as follows:

> C. . . . *If the court desires an expansion of the record or additional findings, either with respect to the recommendation for discipline or sanction to be imposed, it shall remand the case to the Commission for the appropriate directions, retaining jurisdiction, and shall withhold action pending receipt of the additional filing.*

\* \* \*

> *The Supreme Court may* accept or *solicit supplementary filings with respect to* medical or *other information without remand* and prior to an imposition of discipline provided that the parties have notice and an opportunity to be heard thereon.

\* \* \*

> E. *Based upon a review of the entire record the Supreme Court shall file a written opinion and judgment directing such disciplinary action as it finds just and proper. It may* accept, reject, or modify *in whole or in part, the findings and recommendation of the Commission.* In the event that more than one recommendation for discipline for the judge is filed, the court may render a single decision or impose a single sanction with respect to all recommendations.

\* \* \*

F. The Supreme Court may bring up for review *any action taken upon any complaint filed with the Commission, and may also bring up for review a case in which the Commission has failed to act.* (Emphasis added.)[1]

In this case, Judge Griffen was given notice and a probable cause hearing concerning several complaints numbered 02-161, 02-191, and 02-197. Those complaints contained allegations that Judge Griffen's conduct violated five canons — 2(A), 2(B), 3(B)(5), 4(A), and 4(C)(1). After the Commission's hearing, it dismissed all alleged violations except Canon 4(C)(1). As already stated, it is my view that the evidence and record clearly support a finding that Judge Griffen's conduct advancing Coach Richardson's interests violated Canon 2(B) for the reasons described above. The Commission was clearly wrong in dismissing the Canon 2(B) claim.

Rule 12's language in provisions C, E, and F empowers this court to review any action taken upon any complaint filed with the Commission, and we may also bring up for review a case in which the Commission failed to act. Because this court has broad discretion to review the evidence pertaining to any or all allegations filed with the Commission, I would affirm the Commission for reaching the right result, but for a different reason. Here, the record demonstrates that Judge Griffen violated Canon 2(B), and, for that reason, the admonishment sanction should be affirmed. Again, there is nothing vague about Canon 2(B); as Judge Griffen concedes — he appeared before legislative officials and encouraged them to use their authority over the University of Arkansas to obtain a favorable result on Coach Richardson's behalf. The Judge did not mince words, as the majority court does in this appeal, in his attempt to influence legislation and gain support for the Coach's interests in his legal controversy with the University. The majority's vagueness argument regarding Canon 2(B) is nothing but a poorly veiled attempt to inject a "free speech" defense that is nonexistent.

---

[1] This principle of review and affirm has been long settled in *de novo* cases. *See Jegley v. Picado*, 349 Ark. 600, 80 S.W.3d 332 (2002); *Mashburn v. Meeker Sharkey Fin. Group, Inc.*, 339 Ark. 411, 5 S.W.3d 469 (1999); *Alexander v. Twin City Bank*, 322 Ark. 478, 910 S.W.2d 196 (1995).

The majority court parses Rule 12 in an apparent attempt to limit the court's right of review of the Commission's actions or inactions. However, the breadth and scope of Rule 12 is all too obvious by a fair reading of its terms. In this special and unique review of disciplining judges, this court is endowed with the authority to *sua sponte* bring up for review any action taken or not taken upon any complaint filed with the Commission. No one challenges Rule 12 as being in conflict with Amendment 66, so the Rule's plain language should be recognized and applied as it so clearly reads. In the present case, the Commission notified Judge Griffen of complaints the Commission received, which included allegations that he violated Canon 2(B). At the end of the hearing on all allegations, the Commission determined Judge Griffen had violated Canon 4(C)(1), but not Canon 2(B) or the other three canons. Because there was evidence that showed Judge Griffen had violated Canon 2(B), the Commission was clearly wrong in dismissing the Canon 2(B) complaint. While the majority suggests that this court does not have the power to overrule the Commission's decision to dismiss the Canon 2(B) violation, it is sorely mistaken. This is not a criminal case where double jeopardy could be an issue. Whether this action is categorized as being a civil action or one sui generis, the supreme court is charged with the authority to review and remand any case where the Commission erroneously dismissed a complaint. That is the situation here.

In response to my dissent, the majority opinion suggests that the Commission chose not to proceed with a probable cause hearing on the alleged violation of Canon 2(B); the majority opines that there was insufficient evidence to do so. The majority is seriously wrong, and it fails to point to evidence anywhere in the abstract of the record to support its assertion. To the contrary, the Commission, at the end of the probable cause hearing, specifically moved to dismiss all allegations except the allegation concerning Canon 4(C)(1).

Despite this action taken by the Commission members, the majority opinion curiously reads: "[E]ven though the Judicial Commission 'dismissed' all allegations at the end of the probable cause determination, the only violation under investigation at the time, other than a violation of Canon 4(C)(1), was a violation of Canon 4(A)."

If the Commission was only considering Canon 4 during the probable cause hearing, why was it necessary for the Commission to dismiss all allegations except Canon 4(C)(1) at the end of the hearing?[2] Nothing in the abstract of the record reflects that the Commission failed to consider Judge Griffen's conduct as it related to Canon 2(B).

Without question, the Commission heard testimony that related to both Canon 2(B) and Canon 4. When the Commission's hearing began, Judge Griffen's counsel asked what conduct of the Judge was in issue. From the colloquy between counsel and the Commission and its Executive Director, the Judge was informed that his comments concerning Coach Richardson's contract dispute and the Judge's appearance before the Black Caucus would be considered. At this early stage of the hearing, it was clear that the Judge's support for another person (Coach Richardson) was relevant as to whether his comments also violated Canon 2(B).

If there is still any further question on whether Canon 2(B) was in issue at the hearing and whether Judge Griffen's comments violated both Canon 2(B) and Canon 4, one needs only read the testimony the Judge presented at the hearing. For example, the Judge called Professor Morton Gitelman as an expert on the First Amendment and judicial discipline issues. During Professor Gitelman's testimony, he touched on Canons 1, 2, 3, and 4; he further opined that Canons 1, 2, and 3 were fraught with subjectivity and elasticity or vagueness. The Professor also filed with the Commission a written statement which bore on all of these judicial canons and whether Judge Griffen's comments violated those canons. Also, after the close of the Judge's proof, his counsel, in summarizing the Judge's case, made specific reference to Coach Richardson's contract dispute and the Judge's remarks made in support of the Coach. After the hearing, the Commission submitted its report and findings, noting in part that the probable cause hearing involved Complaint No. 02-197; while that complaint alleged violations of Canons 2(B), 4(A), and 4(C)(1), the Commission ruled (in my opinion erroneously) that the Judge's actions constituted only a violation of Canon 4(C)(1). There is no doubt in my mind that the Commission was clearly wrong in determining the Judge's conduct did not violate Canon 2(B).

---

[2] See the attached page of the hearing which bears out that the Commission dismissed all allegations except those relating to Canon 4(C)(1).

While I have great empathy for individuals like Judge Griffen who wish to make a contribution towards improving human rights and strive to make government better, there are, nonetheless, boundaries and limitations when that individual is a judge — elected or appointed. If the judicial branch is to maintain its integrity, it must do so by remaining separate from the legislative and executive branches. A judge must be called on to apply and enforce the law evenhandedly and consistently. A judge who works full time to discharge his or her responsibilities in trying to improve the administration of justice — which is permissible by the judicial canons — has little time to champion other social ills. There are other officials who are given authority to address those other inequities in our democratic government by enacting new laws and setting new policies. Meanwhile, it is of great importance that judges not take sides in legal disputes because of friendships or because of shared personal or private interests. Individuals who want to change the law may do so by serving as a legislator or executive officer — or maybe as a private citizen who can direct, or work for, a group that is trying to make a difference in our society.

In conclusion, I would be remiss in failing to mention the real fear our judicial branch has and likely will face soon. In the not-too-distant future, it appears almost certain that the United States Supreme Court will render a decision which will effectively eviscerate any state government system that now provides for the election of judges. *See Republican Party of Minnesota v. White*, 536 U.S. 765 (2002). In *White*, the Supreme Court, by a 5-4 decision, struck down a Minnesota judicial conduct provision that prohibited a judicial candidate during a judicial campaign from announcing his or her views on disputed or political issues because it violates the First Amendment. It appears to me that, if a judicial candidate, during an election, can voice his or her views on disputed or political issues, the person who has been elected and who then serves as a sitting judge after the election will also have the same First Amendment right to speak out on such issues. It is a chilling and sickening thought that the majority of the Supreme Court will, all in the name of free speech, countenance and empower elected judges to take their strong personal biases and use the authority of the judgeship to render decisions based on personal beliefs, irrespective of how the law should or does read.

While Judge Griffen's case now before this court is important, there is a far greater concern that the Supreme Court's next decision will effectively eliminate elected judges. Perhaps the majority of members on the Supreme Court have an underlying belief that there is little or no politics involved in appointing judges. Certainly, one can gather that thought by reading Justice O'Connor's concurring opinion in *White*, wherein she gave the following various gratuitous and disturbing thoughts:

> Even if judges were able to suppress their awareness of the potential electoral consequences of their decisions and refrain from acting on it, the public's confidence in the judiciary could be undermined simply by the possibility that judges would be unable to do so.

> \* \* \*

> Even if judges were able to refrain from favoring donors, the mere possibility that judges' decisions may be motivated by the desire to repay campaign contributors is likely to undermine the public's confidence in the judiciary.

> \* \* \*

> Minnesota has chosen to select its judges through contested popular elections instead of through an appointment system or a combined appointment and retention election system along the lines of the Missouri Plan. In doing so the State has voluntarily taken on the risks to judicial bias described above. As a result, the State's claim that it needs to significantly restrict judges' speech in order to protect judicial impartiality is particularly troubling. If the State has a problem with judicial impartiality, it is largely one the State brought upon itself by continuing the practice of popularly electing judges.

As long as the Supreme Court majority holds on to such fallacious thoughts and ideas as those expressed by Justice O'Connor above, it is likely that Court's majority will soon author an opinion which will make judges political in all respects. Contrary to the beliefs Justice O'Connor expressed in her opinion in *White*, judges can be elected in nonpartisan elections and serve with integrity and honesty. We presently have thirty-nine states that elect judges, and they have largely avoided the hypothetical

deficits Justice O'Conner says occur when the people elect their judicial officers. I obviously have considerably more confidence in this country's electorate than does the majority of the Supreme Court.

CORBIN and HANNAH, JJ., join this dissent.

ATTACHMENT

66

And we will apply those to the best of our ability in trying to decide this case.

MR. COULTER:  Thank you.

(Whereupon, the Commission members leave the room for deliberation and after a brief recess, the proceedings continued as follows:)

MR. BADAMI:  In the matter of the Probable Cause Hearing in Case No. 02-197, Judge Wendell Griffen, a motion was made by John Everett, seconded by Judge Bill Storey, to dismiss all allegations except the allegation concerning Canon 4C(1).  That motion passed unanimously.

A motion was made to issue an admonishment for the violation of Canon 4C(1) in having a discussion with the Black Caucus.  The motion was made by Judge Plegge, seconded by Reg Hamman, and passed unanimously.

JUDGE WILLIAMS:  Did not pass unanimously.

MR. BADAMI:  Passed 4 to 3.  Don't say unanimously, but 4 to 3.

(Proceedings adjourned at 3:00 p.m.)

D ONALD L. CORBIN, Justice, dissenting. I must respectfully dissent from the majority opinion because I cannot fathom how this court can proclaim that our very own Canon is vague and, therefore, failed to put Judge Griffen on notice that his conduct was impermissible. I base my dissent on two distinct reasons: (1) Canon 4(C)(1) is not vague; and (2) assuming *arguendo* that the exception in Canon 4(C)(1) is open to interpretation, Judge Griffen's conduct in lobbying members of the legislature was so egregious that there can be no doubt that it violated the Canon.

Turning first to the language of Canon 4(C), the majority correctly recognizes that the underlying purpose of this Canon is to preserve judicial independence from the other branches of government. The majority then abandons this notion by erroneously concluding that the phrase "judge's interests" is not clear. In fact, the majority makes much ado about the competing explanations offered by the Judicial Commission and Judge Griffen as to the phrase's meaning. The fact that the parties to this action cannot agree on the meaning of the exception, however, should have no bearing on this court's interpretation of the Canon. We are the ones who approved the Judicial Code in the first place.

This court set forth the method for interpreting our own rules in *Huffman v. Arkansas Disc. & Disab. Comm'n*, 344 Ark. 274, 278, 42 S.W.3d 386, 389-90 (2001), wherein we stated:

> Courts construe their own rules using the same means as are used to construe statutes. *Gannett River Pub. v. Arkansas Dis. & Disab.*, 304 Ark. 244, 801 S.W.2d 292 (1990). The fundamental principle used in considering the meaning of a statute is to construe it just as it reads, giving the words their ordinary and usually accepted meaning. *Boston v. State*, 331 Ark. 99, 952 S.W.2d 671 (1997); *Rush v. State*, 324 Ark. 147, 919 S.W.2d 933 (1996); *Munson v. State*, 331 Ark. 41, 959 S.W.2d 391 (1998).

Another fundamental principle of statutory interpretation is that the court places a statute beside other statutes relevant to the subject matter in question and ascribes meaning and effect to be derived from the whole. *Short v. State*, 349 Ark. 492, 79 S.W.3d 313 (2002). Remaining mindful of these rules of construction, I now turn to Canon 4(C)(1).

Canon 4(C)(1) provides that:

> A judge shall not appear at a public hearing before, or otherwise consult with, an executive or legislative body or official except on matters concerning the law, the legal system or the administration of justice *or except when acting* pro se *in a matter involving the judge or the judge's interests.* [Emphasis added].

It is the latter exception of this Canon that the majority takes issue with, as being vague and not sufficiently notifying Judge Griffen of what behavior is proscribed. The majority reaches this conclusion, however, by ignoring our well-settled principles of statutory construction. As the majority points out in its opinion, the only guidance found regarding the addition of this exception to the Canon comes from a Reporter's Explanation that states, "An additional exception was added for other activities under this rule that are permitted elsewhere by this Code." *See* American Bar Ass'n Standing Comm. On Ethics & Prof'l Responsibility, *Report to the House of Delegates* 35 (Nov. 1989). The majority fails, however, to utilize this guidance and look at the other provisions in the Judicial Code in order to ascertain the intent of the exception.

Indeed, Canon 4(G) touches on this very issue. Canon 4(G) prohibits a judge from practicing law, with the exception that "a judge may act pro se and may, without compensation, give legal advice to and draft or review documents for a member of the judge's family." The Commentary to this Canon is further illustrative, stating in part:

> This prohibition refers to the practice of law in a representative capacity under the Arkansas Constiution, Article 7, § 24 and not in a pro se capacity. A judge may act for himself or herself in all legal matters, including matters involving litigation and matters involving appearances before or other dealings with legislative and other governmental bodies.

This court has recognized that the commentary to a canon, much like the commentary to a statute, is not controlling over the canon's clear language, but is a highly persuasive aid to construing that canon. *Huffman*, 344 Ark. 274, 42 S.W.3d 386; *McGrew v. State*, 338 Ark. 30, 991 S.W.2d 588 (1999).

Clearly, the interests excepted in Canon 4(C)(1), when considered in light of Canon 4(G), are limited to matters of a legal nature. The term "pro se" is a legal term of art. A person does not

appear "pro se" before a doctor. It is entirely possible, though, that a judge may have to appear pro se before a legislative or executive body. One example comes readily to mind. A judge owns several acres of rural land adjacent to a State highway. The Arkansas State Highway Commission commences work on expanding the highway, and in so doing, the Commission utilizes a portion of the judge's land without giving him prior notice of the taking. The judge's only remedy after the taking without his knowledge is to seek damages before the Arkansas Claims Commission. The Claims Commission is an "arm of the General Assembly," and as such, constitutes a legislative body, as envisioned by Canon 4(C)(1). *See Hanley v. Arkansas State Claims Comm'n*, 333 Ark. 159, 166, 970 S.W.2d 198, 200 (1998) (quoting *Fireman's Ins. Co. v. Arkansas State Claims Comm'n*, 301 Ark. 451, 458, 784 S.W.2d 771, 775, *cert. denied*, 498 U.S. 824 (1990)). Under Canon 4(C)(1), the judge would be allowed to appear *pro se* before that legislative body and seek damages as a result of the State's taking of his land. This example conforms with a plain reading of Canon 4(C)(1). It is ludicrous for the majority to opine that the exception is not clear.

I wholeheartedly agree with the majority that the "judge's interests" exception cannot be construed in the manner advanced by Judge Griffen. To accept his interpretation would mean that any judge of this State could lobby executive or legislative bodies or officials on any topic that they feel strongly about. As I pointed out in the oral argument of this case, if we accept Judge Griffen's interpretation of this exception, it would then be acceptable for me to go before legislators and urge them to pass legislation restricting a woman's right to an abortion. All I have to show is that I am a member of a Catholic family and have strong pro-life beliefs. Or, as a person of Cherokee Indian descent, it would be acceptable for me to lobby the governor to appoint more Cherokee Indians to positions in State government. After all, I have an interest in seeing that people of my same descent advance. Such acts would not be an issue if I were simply Citizen Donald Corbin, but I am Judge Donald Corbin, and I must always remain mindful of that title.

The fact that Judge Griffen's interpretation defies all notions of a separate and independent judiciary makes it that much more apparent to me that Canon 4(C)(1) is anything but vague. I am troubled by the fact that the majority opinion gives credence to Judge Griffen's interpretation, even after recognizing that the State has a compelling interest in upholding the doctrine of separation of

powers. In fact, this court recently discussed the importance of this constitutional requirement in *Magnus v. Carr*, 350 Ark. 388, 392, 86 S.W.3d 867, 869 (2002) (citing *Smith v. Page*, 192 Ark. 342, 91 S.W.2d 281 (1936)), and stated:

> The kind of government the people adopted contains three co-ordinate branches. In assigning the government to three different departments, the people intended to secure to each its independency of action . . .

Issues regarding appropriations are strictly within the purview of the General Assembly. When a judge requests legislators to vote to decrease a university's appropriations, he has impermissibly encroached upon a legislative function. If Judge Griffen had been speaking to a group of high school students about his thoughts on the lack of racial diversity at the University, there would be no issue before us. This case is here because he not only spoke to a group of legislative officials, but he also sought to influence how they would vote on a specific appropriations bill. The fact that he claims that he was not acting in his judicial role is of no merit. As the majority correctly points out, a judge cannot divest himself of that role, particularly when that judge introduces himself as a member of the judiciary. Moreover, a judge should not be allowed to shed his robe when he breaches the doctrine of separation of powers.

This court should not ignore the fact that we are the ones who carefully studied and adopted the Judicial Code. We were certainly cognizant of the doctrine of separation of powers when we implemented each of the Canons. As such, I am hard pressed to believe that we intended the "judge's interest" exception to be construed in any manner other than in the most narrow of interpretations. As it stands now, this court has effectively negated Canon 4(C)(1), and there is nothing to prevent a judge from impermissibly lobbying or consulting with members of the other two branches of government and, thereby, causing irreparable damage to the doctrine of separation of powers.

As I stated in the beginning of my dissent, even if I were to agree with the majority that there is insufficient guidance in Canon 4(C)(1) regarding what qualifies as a judge's interest, I do not believe that the Canon is so vague as to fail to put Judge Griffen on notice that his action of lobbying legislators regarding their votes was a direct violation of the Code of Judicial Conduct.

The majority recognized the long-standing principle that for a statute to avoid being vague it must give a person of ordinary intelligence fair notice of what is prohibited. *See Night Clubs, Inc. v. Fort Smith Planning Comm'n*, 336 Ark. 130, 984 S.W.2d 418 (1999). I submit that Judge Griffen, whom I know to be of not ordinary, but high intelligence, had more than fair notice that his speech to a group of legislative officials regarding their votes for appropriations to this State's largest university was conduct prohibited by Canon 4(C)(1). As the United States Supreme Court has recognized, the constitutionality of a statutory provision being attacked as void for vagueness is to be determined by the statute's applicability to the facts at issue. *United States v. Powell*, 423 U.S. 87 (1975). That rule should be applied in the present case; thus, any issues of vagueness regarding Canon 4(C)(1) should be determined in light of the fact that Judge Griffen specifically and blatantly lobbied members of the legislative branch of government. In light of that fact, I cannot agree that Canon 4(C)(1) failed to put Judge Griffen on notice that his conduct was prohibited.

Finally, I understand that Judge Griffen feels very strongly about the subject of racial diversity. It is an important issue, but there are many important issues that judges feel strongly about. When a judge takes the oath of office, however, he does so knowing that his role as a member of the judiciary takes paramount importance over any other role that he may play, including that of a minister or a social advocate. This court has recognized that an independent judiciary is essential for our society, because it cannot function without the trust and confidence of the public in the integrity and independence of its judges. *Huffman*, 344 Ark. 274, 42 S.W.3d 386. By condoning the actions of a judge in attempting to influence legislators regarding their votes, this court has failed not only the entire judiciary, but also the citizens of this State who have placed their trust in us to act judiciously.

For these reasons, I respectfully dissent.

GLAZE and HANNAH, JJ., join in this dissent.

JIM HANNAH, Justice, dissenting. I must respectfully dissent. While I have great admiration for Judge Griffen and his contributions to both the community and the judiciary, I must conclude that the majority has erred in reversing the Arkansas Judicial Discipline and Disability Commission. It is an unpleasant task to explain how Judge Griffen has violated the judicial canons. The courts

dare not be a respecter of persons. On the topic of providing equal justice for all, *Griffin v. Illinois*, 351 U.S. 12 (1956), noted that the desire for equal application stretches back to the *Magna Charta*, and the Court then cited *Leviticus,* wherein the command is given that the person may not be respected, not the poor nor the mighty, and that justice must be equal to all. *See Griffin,* 351 U.S. at 17. Regardless of the subject matter discussed by Judge Griffen before the legislative officials, the judicial canons must be applied to him as they would be applied to any other judge.

I note first that I join in Justice Corbin's dissent and will not again lay out the analysis that Justice Corbin has ably offered. I also note that I share the often voiced concern that the opening of proceedings against a judge based on an anonymous complaint is highly questionable at best. This State's courts and the lives of its judges should not be disrupted by what' often turn out to be unfounded and frivolous complaints. However, in this case my concerns are allayed because the events complained of were public, and a transcript of Judge Griffen's speech is available.

This case is simple. We are presented with an open attempt by a sitting appellate judge to influence the voting and appropriations decisions of the Legislature. Thus, this court should candidly face and remedy this injury to the fundamental interest in an independent judiciary, an institution that has sustained Anglo-American forms of representative government for several hundred years. The majority concludes that an independent judiciary is a compelling state interest, but then abandons the issue. The conclusion is therefore mere *obiter dictum.*

This court should also candidly face the injury done to the separation of powers doctrine laid out in our own constitution. Instead of facing the issues presented, the majority defaults to vagueness in a case where there is none. The majority opinion is long on facts and short on analysis, which is unusual in a case involving statutory interpretation. The facts in a given case quite naturally have no impact on statutory interpretation, but their recitation here makes the side-slide into vagueness more persuasive.

Nothing new or novel is presented to the court in this case. The term at issue has been defined by case law. The term is alleged to have a different meaning in the context of judicial speech. I do not agree, however, where before the canons were adopted, this

court considered the amendments to the judicial cannons, provided them for comment by the public and the bar, and then adopted them. *See In Re Ark. Code Jud. Cond.*, 313 Ark. 735 (1993). In other words, if the judicial canons are likened to statutes, then it is this court that enacted them. In that limited sense, this court acted like a legislative body in adoption of the judicial canons; therefore it is to this court one must turn to determine intent in the language.

In 1841, this court stated, "[t]hat in construing statutes, the intention of the Legislature is a fit and proper enquiry, is too well settled to admit of a doubt." *Woodruff v. State*, 3 Ark. 285, 296 (1841). More recently this court stated, "The basic rule of statutory construction is to give effect to the intent of the Legislature, making use of common sense." *Minnesota Mining & Mfg. v. Baker*, 337 Ark. 94, 100, 989 S.W.2d 151 (1999). Applying common sense leads to the conclusion that a "judge's interest" is what we have always defined it to be. I am left with the haunting and disturbing impression that the majority wishes to wait for the American Bar Association to make changes to the model judicial canons to clarify a "judge's interest." Are we waiting for the American Bar Association to tell us what our own canons mean?

Canon 4(C)(1) is not vague, and Judge Griffen was on notice, and had to know that he was stepping beyond conduct permitted by the canons when he undertook to influence the voting of legislative officials. Had he chosen to do so, he could have sought an advisory opinion from the Arkansas Judicial Ethics Advisory Committee. We need not defer to future amendments. We should declare what the term means in context of the judicial canons if necessary, although I do not believe it is necessary to define a term already defined. *See Strugis v. Skokos,* 335 Ark. 41, 977 S.W.2d 217 (1998). *See also Worth v. Benton County Circuit Court,* 351 Ark. 149, 157, 89 S.W.3d 891 (2002).

The term "judge's interest" has been discussed on a number of occasions by this court.[1] *See Worth, supra; Sturgis, supra.* If Judge

---

[1] The majority argues that "judge's interest" is neither defined nor narrowly tailored, and that the dissent fails to provide guidance on just what constitutes a violation of Canon 4(C). The majority apparently misreads the dissent. The majority chooses to ignore long-standing precedent of this court defining a "judge's interest," which is cited in the dissent. The term "judge's interest" is already well defined by this court, and narrowly tailored. In arguing that the term is neither defined nor narrowly tailored, the majority simply chooses not to

Griffen's definition were adopted, Canon 4(C)(1) would cease to have meaning and such an interpretation would lead to an absurd result contrary to the long stated holdings of this court. *Laird v. Shelnut*, 348 Ark. 632, 74 S.W.3d 206 (2002). The Canon may not be read to be meaningless as the majority notes. The term is clear. Our duty is to follow the law. Nothing in Judge Griffen's address involved an issue in which Judge Griffen was "interested" as that word is used in a legal context. The phrase the majority struggles over is "except when acting *pro se* in a matter involving the judge or the judge's interest." The majority states, "Surely this second exception means other interests than matters dealing with the administration of justice, which is the first exception. But what does it mean?" No great mystery is before us. The majority should first look at "*pro se,*" a term so familiar to lawyers that it scarcely needs to be defined. It means to represent oneself. *Black's Law Dictionary* 1237 (7th ed. 1999). In other words, from the contested phrase we learn that a judge may represent himself or herself, or his or her interests, before a legislative body or officials. "Interest" in a legal sense means:

> 1. [a]dvantage or profit, esp. of a financial nature <conflict of interest>. 2. A legal share in something; all or part of a legal or equitable claim to or right in property <right, title and interest>. .

*Black's Law Dictionary* 816 (7th ed. 1999). The majority ought to note that the legal definition does not include "the state of being concerned," which is apparently the definition that the majority uses. The term interest as it relates to judges is not new, although the majority consciously chooses to treat it as a new term that cannot be deciphered. A "judge's interest" in a legal context has always been interpreted to mean, just as cited from *Black's*, an interest affecting the individual rights of the judge. This is hardly surprising. The concern was and remains that the impartiality and independence of the judiciary may be compromised by the judge's action. *See Worth, supra; Sturgis, supra; Foreman v. Town of Marianna,* 43 Ark. 325 (1884).

---

believe the sky is blue while looking at it. The majority also chooses to analyze the Canon in isolation in order to reach the conclusion of vagueness. The language of someone acting *pro se* that the majority struggles with is language used in the law long before and since the Canons were drafted or adopted. It is language that is very familiar. In taking such a myopic examination of the phrase, "when acting *pro se* in a matter involving the judge or judge's interest," the majority is straining at a gnat and about to swallow the proverbial camel.

The majority notes that the parties cited to the dissent in *Worth, supra,* and that in *Worth,* a proprietary or pecuniary interest was involved. The majority then states, "[i]n the instant case, however, the issue is different. The question now before us is what issues of interest to a judge can be discussed with a legislator." At this point, the majority's analysis becomes confused because the issue is not different. Interest in this case is precisely the same as in *Worth.* The term "issues of interest to a judge" used by the majority introduces a new term into the discussion that appears nowhere in the canons and creates unresolvable confusion. Contrary to the majority's discussion, we are not charting new territory. A judge's interest is a judge's interest whatever the setting. It always has been. What the majority fails to discover is that "judicial interest" in the judicial canons is the same as elsewhere in the law, differing only in application. The interests that preclude a judge from sitting on a case are the same interests that allow a judge to communicate with the legislature or legislative officials because they are interests affecting the judge's rights or property. While a judge should not sit on a case where the judge has an interest in the outcome, that same interest allows the judge to speak to the legislature on his or her own behalf because the judge has an individual right or property at stake, and the judge may represent himself or herself just as any person could. Canon 4(C)(1) merely codifies the rules of conduct judges have abided by for years. The majority in its struggle with a difficult set of facts is inclined to yield to the facts rather than adhere to the principles and doctrines that have sustained an independent judiciary and liberty for so many generations. It is patently plain that a member of the judiciary may not seek to influence how the legislature exercises its power.

As Justice Corbin notes, if a judge is about to lose his property to the construction of a new interstate, he or she has an interest that allows him or her to communicate under Canon 4(C)(1). If a judge has a pecuniary interest that is about to be extinguished by the legislature, he or she may address the issue. These same interests which allow communication under Canon 4(C)(1) would also be interests that would preclude the judge from sitting on a case involving the issues. Ark. Const. art. 7 § 20. Thus, what comprises an interest of the judge is the same whether under Canon 4(C)(1) or art. 7 § 20 of the constitution. Judge Griffen attempted to influence the legislature in decisions on voting and

appropriation in violation of the judicial canons.[2] He addressed the legislative officials on matters that did not involve his own rights or property, and thereby he violated the canons. Since judges first came to be, it is doubtless that there has been concern for whether a judge's behavior outside the court may compromise his or her ability to act in the high office of judge and whether actions outside the courtroom compromise the integrity and independence of the judiciary. That is the issue here.

### An Independent Judiciary

Judge Griffen stated in his response to the commission that:

> Had the complainant bothered to study the newspaper article that reported that appearance, he or she would have learned that I appeared in my own capacity. . . .

At oral argument Judge Griffen again asserted that he could appear before the Legislative Black Caucus in a personal capacity separate and apart from his capacity as a judge. Herein lies the core error. One may not dispense with the judicial robe at will. I must note that in his introduction before he spoke to the Legislative Black Caucus, Judge Griffen stated, among other things about himself, that, "[s]ince January 1, 1996, I served on our State Court of Appeals." The Sixth Circuit Court of Appeals has stated, "A judge does not cease to be a judge when he undertakes to chair a PTA meeting. . . ." *Lynch v. Johnson*, 420 F.2d 818, 820 (6th Cir. 1970). This has long been the case. "A judge is a public officer, who by virtue of his office, is clothed with judicial authorities." *United States v. Clark*, 25 Fed. Cas. 441 (Cir. D. Mass. 1813). A judge may not simply cast aside his or her

---

[2] The Majority asserts that the dissent errs in failing to address the First Amendment issue. There is no First Amendment issue. *Republican Party of Minn. v. White* , 536 U.S. 765 (2002) is not applicable to the facts of this case. *White* involves an announce clause in judicial elections. "The protections the First Amendment affords speech and expressive conduct are not absolute. This Court has long recognized that the government may regulate certain categories of expression consistent with the Constitution." *Virginia v. Black*, 538 U.S. 343 (2003). A judge may not lobby another branch of government. Canon 4(C) prohibits appearance before and consultation with legislative officials, except on "matters concerning the law, the legal system of the administration of justice, or except when acting *pro se* in a matter involving the judge or the judge's interest." Ark. Code of Judicial Conduct Canon 4(C). Obviously, this narrowly tailored limitation on speech protects the compelling state interest in an independent judiciary acknowledged by the majority.

judicial mantel when he or she chooses and walk in life as other men or women. Although Judge Griffen would like to carve out his personal life and separate it from his life as a judge, that simply is not possible. The position of judge is a high calling, and it carries with it obligations not borne by the average person. As the majority states, "A judge may never divest himself or herself from being a judge."

The independence of the judiciary is a matter that transcends the personal concerns and passions of judges, regardless of how laudable or just they may be. Independence of the judiciary must transcend those matters. Liberty is at issue. Our form of government is at issue. In the Federalist No. 78, Alexander Hamilton stated that "[t]he complete independence of the judiciary is peculiarly essential in a limited Constitution." The Federalist No. 78 at 100 (M. Walter Dourne 1901). Earlier in that same essay, Hamilton quoted Charles Montesquieu who said that "there is no liberty if the power of judging be not separated from the legislative and executive powers." *Id.* Hamilton also stated in that same essay that although "individual oppression may now and then proceed from the courts of justice, the general liberty of the people can never be endangered from that quarter; I mean so long as the judiciary remains truly distinct from the legislative and the Executive." *Id.* The Florida Supreme Court set out these same concerns in *Cones v. Cones*, 68 So. 2d 886 (1953):

> When a lawyer dons the ermine and mounts the woolsack he assumes a very serious obligation to the people he serves. Nothing more seriously affects their lives, their property and their safety than his decisions, the weight of which is determined by his wisdom and integrity. The ermine is the symbol of purity, honor and wisdom, that brand of wisdom which is the flower of years and experience. From the time he is clothed with judicial authority he is a marked man. His words and his conduct should inspire confidence; he might well strive to honor the bench instead of having it honor him. The judiciary is the capstone of our democracy but it will be so no longer than its deportment warrants.

*Cones*, 68 So. 2d at 887-8. The judiciary acts as a moderating factor and a control on the excesses that may sometimes arise in representational governments. The Ninth Circuit Court of Appeals recently stated:

> It is the highest calling of federal judges to invoke the Constitution
> to repudiate unlawful majoritarian actions and, when necessary, to
> strike down statutes that would infringe on fundamental rights,
> whether such statutes are adopted by legislatures or by popular
> vote. The constitutional system that vests such power in an inde-
> pendent judiciary does not "test the integrity of ... democracy." It
> makes democracy vital, and is one of our proudest heritages.

*Newdow v. U.S. Congress*, 328 F.3d 466, 471 (9th Cir. 2002). This
court stated long ago that "government can scarcely be considered
free, where the rights of individuals are left solely dependent upon a
legislative body without any restrictions." *Woodruff*, 3 Ark. at 304. It
matters not how just Judge Griffen's concerns may be, we may not,
and we dare not, sacrifice judicial independence and the separation of
powers doctrine to allow this conduct.

### Judge Donovan W. Frank

I feel compelled to address a number of comments directed
at this court by federal district court Judge Donovan W. Frank in
his Memorandum Opinion and Order in the case brought by Judge
Griffen in federal court. *See Griffen v. Arkansas Judicial Discipline and
Disability Commission,* 266 F. Supp. 2d 898 (E.D. Ark. 2003). Judge
Frank stated that he entered his opinion with some dismay, and
that he sympathized with Judge Giffen over the "deafening si-
lence" coming from the Commission and the Arkansas Supreme
Court.

Judge Frank as much as states that this court has been remiss
in failing to address this case. Judge Frank's allegation, that this
court has turned a deaf ear to Judge Griffen's plight is a gravely
serious allegation. It is especially serious as here where it is untrue.
Judge Frank cites *Middlesex County Ethics Committee v. Garden State
Bar Association,* 457 U.S. 423 (1982), where the New Jersey
Supreme Court allows review of constitutional issues in attorney
discipline cases where the attorney files a motion asking the court
for review. In *Middlesex*, the United States Supreme Court noted
that the New Jersey Supreme Court *sua sponte* entertained consti-
tutional issues raised by an attorney in disciplinary proceedings.
Judge Frank is critical of this court for not taking up this matter on
what he characterizes as *sua sponte* review. This court does not
engage in "*sua sponte* review." This court, as all courts, must have
jurisdiction to act. Jurisdiction is the power or authority to hear a

case. *Parker v. Sebourn*, 351 Ark. 453, 95 S.W.3d 762 (2003). Before jurisdiction is acquired or may even be tested, an appeal or petition must be filed in this court. Ark. Sup. Ct. R. 1-2 (2003). This court does not even raise issues *sua sponte* once an appeal has been filed unless it is an issue of jurisdiction. *Ilo v. State*, 350 Ark. 138, 85 S.W.3d 542 (2002). Without an appeal or petition to this court, there is no case to be heard. Ark. Sup. Ct. R. 1-2.

. Contrary to Judge Frank's assertion, the silence of this court was not deafening. This court had nothing to say because nothing had been asked of this court. This court now has jurisdiction of Judge Griffen's petition for a writ of *certiorari* and will decide the case.

GLAZE and CORBIN, JJ., join this dissent.